Case Nos. 14-3744 and 14-3721

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

**Terry Joe Smith**

*Defendant, Appellant, and Cross-Appellee,*

v.

**United States of America**

*Plaintiff, Appellee, and Cross-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division
Case No. 2:14-cr-00006-WTL-CMM
Honorable William T. Lawrence

---

**OPENING BRIEF AND REQUIRED SHORT APPENDIX
OF APPELLANT TERRY JOE SMITH**

---

MUNGER, TOLLES & OLSON LLP
Guha Krishnamurthi
*Guha.Krishnamurthi@mto.com*
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendant, Appellant, and Cross-Appellee
TERRY JOE SMITH

---

**ORAL ARGUMENT REQUESTED**

---

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 14-3744, 14-3721

Short Caption: United States v. Terry Joe Smith

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Terry Joe Smith

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Munger, Tolles & Olson, LLP; The Law Office of John L. Tompkins;

The Association of Brown, Tompkins, Lory, and Mastrian

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: s/ Guha Krishnamurthi          Date: July 9, 2015

Attorney's Printed Name: Guha Krishnamurthi

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes  X    No _____

Address: Guha Krishnamurthi; Munger, Tolles & Olson, LLP;

355 South Grand Avenue., 35th Floor, Los Angeles, CA 90071-1560

Phone Number: (213) 683-9233          Fax Number: (213) 593-2833

E Mail Address: guha.krishnamurthi@mto.com

rev. 01/15 GA

# TABLE OF CONTENTS

**Page**

I.    JURISDICTIONAL STATEMENT .................................................. 1

II.   ISSUES PRESENTED FOR REVIEW .............................................. 1

III.  STATEMENT OF THE CASE ...................................................... 2

    A.    Facts Relating to Count 2: Arrest of Cletis Warren .............................. 3

    B.    Facts Relating to Count 3: Arrest of Jeffrey Land ............................... 9

    C.    Proceedings in the District Court ............................................. 11

        1.    Smith's Motion In Limine and the Officer Lay Testimony
            on the Reasonableness of Smith's Force ...................................... 11

            a.    Count 2 .................................................................. 12

            b.    Count 3 .................................................................. 14

        2.    Warren's Testimony That He Had Been Restrained Before
            Being Punched and the Government's Subsequent
            Rehabilitation of Warren's Testimony ....................................... 15

        3.    Denial of Smith's Rule 29 Motion for Judgment of
            Acquittal, Sentence, and Entry of Judgment ............................... 16

IV.   SUMMARY OF ARGUMENT ....................................................... 18

V.    ARGUMENT ........................................................................ 19

    A.    The Admission of Officer Testimony That Smith's Conduct Was
        Unreasonable and Excessive Was Legal Error, Warranting
        Reversal of Smith's Convictions ............................................. 19

        1.    Standard of Review and Legal Framework ................................. 20

        2.    The Officers' Testimony Constituted Improper Expert
            Testimony Wrongfully Admitted as Lay Opinion
            Testimony in Contravention of Rule 701(c) ............................... 22

        3.    The Officers' Conclusions That Smith's Exercises of Force
            Were Unreasonable Were Not Limited to Opinions Based
            on Their Own Perception and Therefore Violated Rule
            701(a) .................................................................... 29

    B.    The Evidence Adduced at Trial Was Insufficient to Sustain the
        Convictions on Counts 2 and 3 ............................................. 34

        1.    Standard of Review and Legal Framework ................................. 35

        2.    The Insufficiency of the Evidence on Count 2 and Count 3 ....... 37

a.    Count 2 ........................................................ 37

b.    Count 3 ........................................................ 42

C.    The Government's Use of Warren's False Testimony Was Improper and Warrants Reversal of Smith's Conviction on Count 2.............................................................................. 45

1.    Legal Framework and Standard of Review ................................ 45

2.    The Government's Use of Warren's False Testimony Constituted Error ...................................................... 47

3.    That Error Is Clear and It Affected Smith's Substantial Rights ........................................................................ 50

4.    This Clear and Prejudicial Error Seriously Affects the Fairness, Integrity, and Public Reputation of Judicial Proceedings ................................................................ 50

VI.    CONCLUSION ................................................................ 51

# TABLE OF AUTHORITIES

**Page**

FEDERAL CASES

*Compania Administradora de Recuperacion de Activos Administradora de
    Fondos de Inversion S.A. v. Titan Int'l, Inc.,*
    533 F.3d 555 (7th Cir. 2008) ................................................................. 21, 22

*Giglio v. United States,*
    405 U.S. 150 (1972) ................................................................. 45, 50, 51

*Graham v. Connor,*
    490 U.S. 386 (1989) ................................................................. 36, 38

*Kladis v. Brezek,*
    823 F.2d 1014 (7th Cir. 1987) ................................................................. 24-25

*Mooney v. Holohan,*
    294 U.S. 103 (1935) ................................................................. 45

*Morissette v. United States,*
    342 U.S. 246 (1952) ................................................................. 39-40

*Napue v. People of State of Ill.,*
    360 U.S. 264 (1959) ................................................................. 49, 51

*Pyle v. Kansas,*
    317 U.S. 213 (1942) ................................................................. 45

*Screws v. United States,*
    325 U.S. 91 (1945) ................................................................. 36-37

*Tome v. United States,*
    513 U.S. 150 (1995) ................................................................. 49 n.14

*Tribble v. Evangelides,*
    670 F.3d 753 (7th Cir. 2012) ................................................................. 22, 25-26

*United States v. Agurs,*
    427 U.S. 97 (1976) ................................................................. 45

*United States v. Atkinson,*
    297 U.S. 157 (1936) ................................................................. 47

*United States v. Beck,*
    418 F.3d 1008 (9th Cir. 2005) ................................................................. 29

*United States v. Boyd*,
  55 F.3d 239 (7th Cir. 1995) ........................................................ 45, 46

*United States v. Bradley*,
  196 F.3d 762 (7th Cir. 1999) ........................................ 37, 39, 40, 42

*United States v. Brooks*,
  748 F.2d 1199 (7th Cir. 1984) .............................................. 35, 38

*United States v. Brown*,
  250 F.3d 580 (7th Cir. 2001) ................................................ 36, 38

*United States v. Christian*,
  673 F.3d 702 (7th Cir. 2012) ........................................ 23, 25, 26

*United States v. Conn*,
  297 F.3d 548 (7th Cir. 2002) ........................................ 22-23, 25

*United States v. Cooper*,
  591 F.3d 582 (7th Cir. 2010) ........................................ 21, 27-28

*United States v. de Soto*,
  885 F.2d 354 (1989) ............................................................... 20

*United States v. DiSantis*,
  565 F.3d 354 (7th Cir. 2009) ...................................................... 36

*United States v. Fenzl*,
  670 F.3d 778 (7th Cir. 2012) ...................................................... 24

*United States v. Freeman*,
  650 F.3d 673 (7th Cir. 2011) ................................................ 46, 50

*United States v. Glenn*,
  312 F.3d 58 (2d Cir. 2002) .................................................. 33-34

*United States v. Haynes*,
  729 F.3d 178 (2d Cir. 2013) ................................................ 22, 23

*United States v. Isaacs*,
  593 F.3d 517 (7th Cir. 2010) ...................................................... 20

*United States v. Jackson*,
  688 F.2d 1121 (7th Cir. 1982) .................................................... 29

*United States v. Jaimes-Jaimes*,
  406 F.3d 845 (7th Cir. 2005) ................................................ 46, 47

*United States v. Johnson*,
    729 F.3d 710 (7th Cir. 2013) ........................................................... 37 n.11

*United States v. Jones*,
    739 F.3d 364 (7th Cir. 2014) ........................................................... 25

*United States v. Lupton*,
    620 F.3d 790 (7th Cir. 2010) ....................................................... 23, 27

*United States v. Manske*,
    186 F.3d 770 (1999) ......................................................................... 21

*United States v. Mansoori*,
    480 F.3d 514 (7th Cir. 2007) ........................................................... 21

*United States v. Noel*,
    581 F.3d 490 (7th Cir. 2009) ........................................................ 27 n.6

*United States v. Olano*,
    507 U.S. 725 (1993) ................................................................. 46-47, 51

*United States v. Peoples*,
    250 F.3d 630 (8th Cir. 2001) ................................................. 23, 27, 30

*United States v. Perkins*,
    470 F.3d 150 (4th Cir. 2006) ........................................................... 33

*United States v. Rea-Beltran*,
    457 F.3d 695 (7th Cir. 2006) ........................................................... 21

*United States v. Sanfilippo*,
    564 F.2d 176 (5th Cir. 1977) ........................................................... 50

*United States v. Silva*,
    140 F.3d 1098 (7th Cir. 1998) ...................................................... 20-21

*United States v. Truong*,
    425 F.3d 1282 (10th Cir. 2005) ....................................................... 36

*Washington v. Dep't of Transp.*,
    8 F.3d 296 (5th Cir. 1993) ............................................................... 29

## FEDERAL STATUTES

18 U.S.C. § 242 .......................................................................... passim

18 U.S.C. § 3231 ................................................................................ 1

28 U.S.C. § 1291 ................................................................................ 1

## FEDERAL RULES

FED. R. APP. P. 4 ............................................................................... 1

FED. R. CRIM. P. 29 ......................................................................... 35

FED. R. CRIM. P. 52 ................................................................... 46, 51

FED. R. EVID. 701 .................................................................... passim

FED. R. EVID. 702 ............................................................... 27 & n.5

FED. R. EVID. 801 ............................................................... 48 n.12

## I.   <u>JURISDICTIONAL STATEMENT</u>

The jurisdiction of the United Stated District Court for the Southern District of Indiana, Terre Haute Division was founded upon 18 U.S.C. § 3231.  A grand jury sitting in that district charged former police officer Terry Joe Smith with four counts of violating 18 U.S.C. § 242, Deprivation of rights under color of law.

The jurisdiction of the United States Court of Appeals for the Seventh Circuit is founded upon 28 U.S.C. § 1291.  Smith was convicted on two counts of violating 18 U.S.C. § 242, with judgment entered by the district court on December 12, 2014. Smith filed his timely notice of appeal on December 18, 2014.  *See* FED. R. APP. P. 4(b)(1)(A).

## II.   <u>ISSUES PRESENTED FOR REVIEW</u>

1.     Did the district court commit reversible error in admitting the opinion testimony of several police officers that Smith's use of force against non-complying arrestees was objectively unreasonable or excessive, where—in direct contravention of Federal Rule of Evidence 701—the officers who testified were not qualified or disclosed as expert witnesses and did not limit their testimony to opinions that were rationally based on their *own* perceptions?

2.     Was the evidence insufficient to permit a rational jury to find, beyond a reasonable doubt, that, with respect to the two offenses of conviction, Smith both subjected an individual to unreasonable force and intended to subject the individual to unreasonable force?

3.     Did the government prejudice Smith's Due Process rights by presenting and bolstering perjured testimony that one of the arrestees was

supposedly already handcuffed and shackled when Smith allegedly applied the charged physical force against the arrestee?

## III.    STATEMENT OF THE CASE[1]

Defendant–Appellant Terry Joe Smith[2] was charged in the United States District Court of the Southern District of Indiana, Terre Haute Division with four counts of violating 18 U.S.C. § 242, Deprivation of Civil Rights Under Color of Law. RSA, at A01-A03.  Section 242 of Title 18 of the United States Code reads in relevant part:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person … to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States … shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section … shall be fined under this title or imprisoned not more than ten years, or both[.]

18 U.S.C. § 242.

In its opening charge to the jury, the district court stated that, on each of the four counts alleging a violation of 18 U.S.C. § 242, Smith was charged with the "use of unreasonable force by a law enforcement officer [Smith] acting under color of law." Tr.1 at 6:1-6:3.

---

[1] Citations to the record use the following abbreviations: "RSA" means the Defendant–Appellant's Required Short Appendix. "Dkt. #" means the district court's docket entry number. "Tr.#" means the trial transcript volume number. "Sent.Tr." references the district court's sentencing transcript from December 4, 2014. When appropriate, each record citation will be followed by page (and line numbers) where the cited material may be found. Citations to the Required Short Appendix use the "A" numbering found at the bottom of the page.

[2] Defendant–Appellant Terry Joe Smith is herein referred to by "Deputy Terry Joe Smith," "Deputy Smith," or "Smith."

After a five-day jury trial, Smith was acquitted on two of the four counts and convicted on the two other counts. RSA, at A41. The two convictions, on counts 2 and 3 of the indictment, arose from two separate incidents in which Smith was performing his duties as a Deputy in the Putnam County Sheriff's Department. RSA, at A02.

### A.    Facts Relating to Count 2: Arrest of Cletis Warren

On September 7, 2012, the Putnam County Sheriff's Department made arrangements to apprehend Cletis Warren. Tr.1 at 27:25-28:21, 65:23-66:8. Warren was wanted on an arrest warrant; he had previously been convicted of methamphetamine possession and allegedly had violated his supervised release conditions. Tr.1 at 10:11-10:18, 28:16-28:21, 65:14-66:25. Warren testified at trial that, on the day in question, he had used a quarter gram of methamphetamine and had been drinking. Tr.2 at 168:12-168:23. Indeed, he was known in the community to be a methamphetamine user. Tr.1 at 73:11-73:16.

The law enforcement contingent for Warren's apprehension was significant in number. It included Deputy Terry Joe Smith, Deputy Philip Troyer, Deputy John Chadd, and Deputy Josh Boller of the Putnam County Sheriff's Department, and Officer Charlie Hallam with the Cloverdale Police Department. Tr.1 at 29:8-29:21. Based on the help of an informant named Billy Jones, the officers believed that Warren would be in the area of the Stardust Mobile Home Park in Cloverdale, Indiana. Tr.1 at 27:25-28:21, 28:16-29:7.

That evening, Warren was in the identified pickup truck with Billy Jones and another passenger, Jenna Guthrie. Tr.2 at 159:20-159:24. It was raining. Tr.1 at

33:6-33:7.  The officers, all in separate vehicles, were positioned to apprehend Warren.  Tr.1 at 30:17-30:18, 93:8-93:10.  When the officers spotted Warren in his truck, three of the officers, in three separate cars, began to follow him and activated their vehicle lights.  Tr.1 at 30:24-31:13.  Two other cars were positioned in a different place.  Tr.1 at 31:14-31:16, 93:17-93:24.  The idea was for the five cars to surround Warren such that he was "hemmed in."  Tr.1 at 31:17-31:23.

As this plan was being executed, according to Deputy Troyer, it "didn't appear that he [Warren] was going to pull over."  Tr.1 at 31:25-32:1.  Indeed, Deputy Chadd testified that he heard Warren accelerate in his pickup truck towards the police vehicles.  Tr.1 at 115:13-115:14.  Billy Jones testified that when Warren saw the police, "[h]e freaked out and downshifted" the pickup truck.  Tr.2 at 182:21-182:24.  When Deputy Boller's car came to "box him in," Warren's truck collided with Deputy Boller's car.  Tr.1 at 32:4-32:5, 94:16-94:19.  The pickup Warren had been driving then veered into the grass by the road.  Tr.1 at 32:8-32:13, 94:20-94:22.  Deputy Troyer stayed back and exited his vehicle; he wanted to be "ready for a foot pursuit" as he "didn't know what [Warren] was going to do, if [Warren] was going to take off running towards the woods…."  Tr.1 at 32:16-32:19.  Officer Hallam similarly testified that his task was to make sure that Warren did not "get out into the road or through the field or into the woods" to run from the officers.  Tr.2 at 146:8-146:10.  Officer Chadd also testified that, after the collision, he positioned himself to "keep [Warren] from getting in the woods."  Tr.1 at 115:22-116:7.

Shortly afterwards, Deputy Troyer witnessed Deputy Smith's car collide with the back of Warren's pickup in the grass. Tr.1 at 32:23-33:5. At this time, Warren got out and jumped into the back of the pickup truck he had been driving. Tr.1 at 33:9-32:10; Tr.2 at 146:12-146:14. Warren testified that, as he was getting out of the truck, a car was "sliding toward[s]" the truck and he "jumped up on the hood of the car and got into the bed of the truck to avoid the collision." Tr.2 at 160:22-160:25. No other witness corroborated Warren's explanation of why he jumped into the bed of the pickup truck.

Warren was yelling something when he was in the bed of the truck. Deputy Troyer and Deputy Boller testified that Warren was saying "I'm sorry" to Deputy Boller, in reference to the earlier vehicle collision. Tr.1 at 33:13, 95:22-96:3. Warren himself and Officer Hallam testified that Warren was yelling, "I'm done." Tr.2 at 161:13, 147:5.

Deputy Boller jumped into the back of the pickup with Warren. Tr.1 at 33:14-33:15, 95:18-95:21; Tr.2 at 161:24-162:2. Deputy Troyer had his taser drawn. Tr.1 at 33:16-33:18. Deputy Troyer then put away his taser as Deputy Boller was nearby; Deputy Troyer was "not going to tase the guy [Warren] when … one of our deputies [was] in the back of the truck with him." Tr.1 at 33:18-33:23. Troyer then climbed into the back of the pickup truck. Tr.1 at 33:18-33:23, 97:20-97:21.

Warren lay down on his back in the bed of the pickup. Tr.1 at 33:24-34:1. According to Deputy Troyer, he and Deputy Boller then attempted to put Warren in handcuffs, but could not do so because Warren was not releasing his hands. Tr.1 at

34:10-34:15, 70:3-70:9. Deputy Boller testified that Warren was "being stiff with us," that Warren "wasn't doing exactly what we were telling him to do." Tr.1 at 97:10-97:14. The officers had conflicting testimony about how Warren was positioning his hands. Deputy Troyer first testified that Warren was clenching his arms close to his chest, but later stated that Warren's hands were beneath him. Tr.1 at 34:10-34:15, 70:3-70:9. Deputy Boller stated that Warren's arms and feet were up in the air. Tr.1 at 97:10-97:14. Deputy Troyer, Deputy Boller, and the other officers all unanimously testified at trial that Warren was not placed into restraints until *after* four officers carried him out of the back of the pickup onto the ground. Tr.1 at 34:10-34:19, 98:8-98:11, 120:20-120:24; Tr.2 at 148:14-148:17. Warren, by contrast, falsely testified that the two officers somehow managed to both shackle his feet and handcuff him in the bed of the truck before being carried out. Tr.2 at 171:6-171:12.

In passing Warren out of the pickup, Deputy Troyer lifted up Warren by the legs while Deputy Boller lifted up Warren by his arms, under his armpits. Tr.1 at 34:16-34:17. While they were carrying him, Warren was facing upwards. Tr.1 at 34:16-34:17. They intended to pass him over the side of the truck to other deputies standing next to the truck. Tr.1 at 34:18-34:19, 97:24-97:25. Deputy Troyer testified that when the officers were trying to detain Warren, though Warren was not punching or kicking, he was "flailing a little bit." Tr.1 at 35:5-35:6.

As Warren was being lowered out of the pickup truck, Smith punched Warren with a closed fist. Tr.2 at 148:23-148:24. After that, Warren was then handcuffed,

6

Tr.1 at 98:23-98:25, 120:23-120:24, and photographed by the officers. Tr.1 at 120:25-121:2. An ambulance arrived at the scene to tend to Warren. Tr.2 at 185:8-185:9. Billy Jones, the informant, testified that he saw "Warren [lying] on his back on a stretcher with a neck brace on." Tr.2 at 184:23-184:25. At that time, Jones testified he heard Smith say, "'I guarantee I broke that m-----f-----'s nose.'" Tr.2 at 186:7-186:8 (altered). Afterwards Warren was taken to the hospital and released the same day. Tr.1 at 121:23-122:1, 38:21-38:23, 79:6-79:10.

Officer Downing of the Putnam County Sheriff's Department testified that, after the incident that evening, at the jail's attached garage facility, he saw part of a video of the incident. Tr.2 at 206:20-206:24. He testified that Deputy Smith was playing the video on Smith's vehicle monitor and a half-dozen other individuals were watching along. Tr.2 at 207:5-207:25. Downing did not see the whole video and in particular did not see Smith punch Warren. Tr.2 at 207:11-208:3. Later, after receiving a grand jury subpoena in February 2014 relating to Smith, Putnam County Sheriff's Department's Chief Deputy Helmer sought video tapes from the vehicles of Deputy Troyer, Deputy Boller, Deputy Smith, and Deputy Chadd. Tr.2 at 196:23-199:4. Helmer only recovered a tape from Deputy Boller's vehicle; he was not able to recover tapes from the vehicles of Deputy Troyer, Deputy Smith, or Deputy Chadd. Tr.2 at 199:5-199:24.

After the incident, Deputy Troyer was assigned to write a report of the incident, which he testified that he prepared within two days of the incident.[3] Tr.1

---

[3] The Police Report was offered as Government Exhibit 22 and can be found at RSA, at A08.

at 39:2-39:11.  Troyer further testified that Deputy Chadd aided him in preparing the report.  Tr.1 at 39:17-39:18.  Deputy Troyer stated that the report contained various inaccuracies.  According to Troyer, the report wrongly stated that Warren's truck struck Smith's officer vehicle.  Tr.1 at 40:17-41:6.  Furthermore, the report wrongly stated that Warren "resist[ed] by rolling to his stomach, kicking his legs, attempting to kick deputies and … not show[ing] his hands"; instead, Troyer testified at trial that Warren was "simply flailing around."  Tr.1 at 41:11-41:19.  The report also stated that Warren "sustained minor facial injuries," but Troyer testified at trial that Warren's injuries were not minor.  Tr.1 at 42:10-42:23.  The report also failed to mention that Smith threw a punch at Warren.  Tr.1 at 42:10-42:15.  Troyer stated that he was directed by Deputy Chadd to write the report characterizing Warren's injuries thusly and omitting discussion of Smith's punch, and further that Deputy Chadd lied about the incident.  Tr.1 at 43:17-43:19, 72:4-72:14.

Deputy Troyer testified that, after the incident, Smith insulted Troyer and Boller because Troyer and Boller told Smith that they would not have punched Warren.  Tr.1 at 44:16-44:22.  Deputy Chadd testified that after the incident, Smith was "proud, bragging that he [threw the punch].  He didn't see an issue with it, and that's what he told us."  Tr.1 at 133:13-133:14.  Officer Hallam testified that Smith was bragging about the incident and "basically was stating that 'He [Warren] f---ing deserved it.'"  Tr.2 at 152:13 (altered).  Deputy Boller testified that Smith "more or less told me that I was scared to do my job and I was scared to punch somebody in the face if I had to."  Tr.1 at 100:15-100:17.

8

## B.    Facts Relating to Count 3: Arrest of Jeffrey Land

On the evening of June 26, 2013, Putnam County Sheriff Department officers were dispatched to respond to a domestic altercation at the Lazy Acres Mobile Home Park in Greencastle, Indiana. Tr.1 at 48:10-49:6; Tr.2 at 324:11-324:23. The law enforcement contingent included Deputy Troyer, Deputy Biggs, and Deputy Smith. Tr.1 at 49:13-49:21. It was raining heavily, and when Deputy Troyer arrived at the location, a woman, Belinda Leathers, was already outside. Tr.1 at 49:2-49:12; Tr.2 at 325:18-325:19. She approached his vehicle and Troyer interviewed Leathers about the incident. Tr.1 at 49:2-49:23.

Jeffrey Land—who was at the time in a relationship with Leathers—battered Leathers. Tr.2 at 325:6-325:8, 211:12-211:16. As a result, Leathers had called the police and fled the residence to wait for their arrival. Tr.2 at 325:9-325:17. Land testified that he had been drinking that evening—a six-pack of tall beers and a half-pint of some variety of hard liquor—but claimed that he was only "[h]alfway" intoxicated. Tr.2 at 211:17-212:2.

After Deputy Troyer interviewed Leathers, Deputy Troyer and Deputy Smith walked to Land's residence, where Deputy Smith took Land into custody. Tr.1 at 49:24-50:3, 81:6-81:7. Officer Troyer testified that, upon seeing Land, "[i]t was obvious [Land] was intoxicated." Tr.1 at 81:14-81:15. Deputy Smith handcuffed Land with his hands behind his back. Tr.2 at 213:17-214:1. The officers then conducted a pat down of Land and took a knife away from him. Tr.2 at 214:2-214:17.

Smith walked Land to Smith's patrol car, which was somewhere in the range of 20 to 100 yards away. Tr.2 at 214:23-215:5, 235:18-236:3. According to Land's testimony, once at the car, Smith stood Land so that Land was facing toward the passenger door of the car. Tr.2 at 216:13-216:14. Land turned around to ask Smith what he—Land—had done. Tr.2 at 216:15-216:16. Smith then turned Land around, "slammed" him against the car, and said, "I said stand there." Tr.2 at 216:17-216:18. Then Land turned around once more and, in response, Smith threw Land to the ground. Tr.2 at 216:18-216:21. Land testified that he was thrown facing the ground. Tr.2 at 216:20-216:21. Leathers also testified that she saw Land facing the ground. Tr.2 at 330:15-330:16. Officer Biggs testified that Land was thrown face up and that Land's back hit the ground. Tr.2 at 237:25-238:2.

Land stated that, when he was slammed to the ground, Smith said to Land something to the effect of, "You're not such a tough guy." Tr.2 at 217:1-217:4. After Land was on the ground, Smith then placed his knee on Land's back. Tr.2 at 217:15-217:17. As a result, Land then defecated. Tr.2 at 217:15-217:17, 238:15-238:17. Leathers testified that during the interaction, she heard Land screaming repeatedly that "he was in bed" and that she heard someone—not Land—say something about "hands on a woman." Tr.2 at 329:22-330:2.

According to Deputy Biggs, a medical ambulance was called, and after an inspection, Land was taken directly to jail; he was not taken to the hospital. Tr.2 at 239:1-239:9. Land testified that he was not inspected by a medic and that, though there was an ambulance at the scene, it was for Leathers. Tr.2 at 226:8-226:19.

Deputy Biggs testified that, after the incident, at the jail, Smith stated to Land (while Biggs overheard) in a humorous tone that it "wasn't the first time that he's made somebody defecate himself." Tr.2 at 239:11-239:22.

### C.    Proceedings in the District Court

#### 1.    *Smith's Motion In Limine and the Officer Lay Testimony on the Reasonableness of Smith's Force*

Prior to trial, on August 25, 2014, Smith filed a motion *in limine* seeking to "limit the Government's ability to ask lay and law enforcement witnesses for their opinions on whether Smith's use of force was appropriate in each of the four incidents at issue in this cause." Dkt. 37, at 1-2. It also sought "to limit the Government's ability to ask any witness if they would have used the same force under the circumstances." Dkt. 37, at 2. The government opposed Smith's motion *in limine* on this point. Dkt. 46, at 3-4.

The district court denied the motion, although the transcript and docket do not specifically recite that ruling. The court's ruling is reflected in, and confirmed by, its ruling on an objection during the questioning of Officer Troyer. Smith's counsel objected to a question whether Smith's use of force was excessive, and the district court overruled the objection and allowed the question, stating that it was "covered by the motion in limine." RSA, at A06-A07 (Tr.1 at 43:23-44:2). In accordance with the court's ruling, many of the officers who served as government

11

witnesses against Smith testified as to the unreasonableness of Smith's conduct, and the government did not seek to qualify any of those witnesses as experts.[4]

### a.     Count 2

With respect to count 2, involving Cletis Warren, the government presented the testimony of Officer Troyer, Officer Boller, Officer Chadd, and Officer Hallam who testified that, in their opinion, Smith's force was unreasonable or excessive. Tr.1 at 44:4-44:7, 99:20-99:21, 127:9-127:13; Tr.2 at 151:24-152:1.

Officer Troyer testified that he did not see Warren's face when Warren was punched. Tr.1 at 35:19-35:24. Instead, Troyer heard a "pop" that sounded like a "tomato hitting a wall." Tr.1 at 35:25-36:3. He then observed that Warren's nose was bleeding and Warren's face was covered in blood. Tr.1 at 36:6-36:8. Troyer testified that he only learned that Smith punched Warren, when, after the incident, he overheard Smith admit to Sheriff Fenwick that he had punched Warren. Tr.1 at 38:9-38:16. In response to the government's question whether Deputy Smith's use of force was reasonable or unreasonable, Troyer answered that it was "[u]nreasonable." Tr.1 at 44:4-44:7.

Officer Boller also testified that he did not see what had happened. Tr.1 at 98:17-98:18. He heard a "loud noise that sounded like a tomato kind of hitting a

---

[4] During Smith's counsel's questioning of Sheriff Fenwick, the government objected that Fenwick had not been qualified as an expert and therefore could not testify as to his opinions. Tr.3 at 365:14-365:20, 366:8-366:13. In response, the district court stated that "the other officers' opinion as to excessive force was based on their observation; and that's why that came in as not necessarily opinion, but it's just their observation based upon their own particular qualifications." Tr.3 at 366:14-367:18. The government added that the other officers' testimony "came in as lay opinion. [] Not expert opinion, lay opinion." Tr.3 at 366:19-367:22.

concrete wall." Tr.1 at 98:15-98:16. He observed Warren's face and saw that there

was "some blood on his face and swelling in his eyes." Tr.1 at 99:1-99:2. Just like

Troyer, Boller only learned that Smith punched Warren when, later, Smith had said

he punched Warren. Tr.1 at 98:19-98:20. In response to the government's question,

Boller affirmed that he believed that Smith's use of force was excessive. Tr.1 at

99:20-99:22.

Officer Chadd also testified that he did not see Warren's face at the moment

of the punch. Tr.1 at 119:14-119:23. Rather, Chadd stated he heard a "skin-on-skin

smack," which caused him to look at Warren's face. Tr.1 at 119:17-119:20. He saw

Warren's "nose and eye area swelling up" and "lots of blood on his face." Tr.1 at

119:21-119:23. Chadd stated that he learned that Smith had punched Warren

because Warren stated immediately afterwards that Smith had punched him and

because, as Chadd and Smith were handcuffing Warren, Smith himself stated that

he had punched Warren. Tr.1 at 120:7-120:19. Prompted by the government's

query whether Smith's force was unreasonable, Chadd responded that he believed it

was "unreasonable." Tr.1 at 127:9-127:13. In reaching this conclusion, Chadd also

provided an opinion as to when striking someone in the head with a closed fist

would be permissible. Chadd was asked, "[D]uring the course of your training as a

deputy and as a police officer, have you had training about when it was permissible

to use a closed fist to strike someone to the head?" Tr.1 at 126:17-126:20. Chadd

responded that he had and that according to that training, an officer is only allowed

to do this in a "deadly force situation, fighting for your life." Tr.1 at 126:23. He

13

further explained that a "deadly force situation" is when someone is "absolutely physically overbearing you," and gave examples such as when "[t]hey're trying to get my gun, they've got a weapon, a club, [or they're] choking me [] out." Tr.1 at 126:24-127:1.

Officer Hallam testified that he heard a sound and "saw Deputy Smith strike [Warren] in the left eye with his fist." Tr.2 at 148:18-148:24. Right afterwards, looking at Warren's face, Hallam saw "a little bit of redness and swelling, maybe a little bit of blood." Tr.2 at 149:5-149:8. In response to the government's query, Hallam assented that he believed that Smith's use of force was unreasonable. Tr.2 at 151:24-152:1. The government also asked Hallam about his police training. First the government asked, "During your training as an officer and deputy, are you trained on when you can use a punch to the face?", to which Hallam answered, "Not generally, no." Tr.2 at 151:16-151:18. The government then asked Hallam, "When would be appropriate to punch someone in the face based off of your training?" Tr.2 at 151:19-151:20. Hallam responded that "if you were to punch somebody in the face or anywhere else outside of what we're normally trained to do would be almost lethal force." Tr.2 at 151:21-151:23.

### b.    Count 3

With respect to count 3, involving Jeremy Land, the government presented the testimony of Officer Biggs that Smith's force was unreasonable. Biggs stated that he saw Smith escort an intoxicated Land to Smith's patrol car. Tr.2 at 237:14-237:16. He then lost sight of them briefly and, when he looked back, he saw Land "in the air[,] horizontal to the ground." Tr.2 at 237:20-237:24. Afterwards, Biggs

testified that Smith "immediately dropped his knee down onto [Land's] sternum" and that, a result, Land defecated himself.  Tr.2 at 238:13-238:17.  Biggs further stated that he did not hear anything that suggested Land was resisting arrest and thereby concluded that Land was not resisting arrest.  Tr.2 at 238:21-238:23, 240:3.  Biggs understood Smith's exercise of force to be "throwing [Land] to the ground and driving his knee into his back or sternum."  Tr.2 at 240:7-240:10.  Prompted by the government's question, Biggs testified that, in his opinion "based on [his] observations at the scene," Smith's use of force against Land was "unreasonable."  Tr.2 at 239:23-240:1.

### 2.    *Warren's Testimony That He Had Been Restrained Before Being Punched and the Government's Subsequent Rehabilitation of Warren's Testimony*

As discussed, Warren falsely testified at trial that, while he was still in the back of the pickup truck, Officer Boller and Officer Troyer "handcuffed [him] and shackled [him] and put [him] down."  Tr.2 at 161:21-162:2.  The government never contended that this testimony was true, instead arguing in closing that Warren's claim that he was already shackled was a "red herring that doesn't really matter."  Tr.4 at 539:19-539:20; *see also* Tr.4 at 540:3-540:8 (government suggesting that perhaps Warren was "disoriented" or that he somehow confused the officers' "restraining him" by hand as if it were handcuffs and shackles).  Nonetheless, when Smith's counsel on cross-examination attacked the credibility of Warren's contention that he had been handcuffed and shackled, the government affirmatively sought to bolster Warren's false testimony by showing that he had made a similar claim before the grand jury.

Specifically, after Warren testified that he had been handcuffed and shackled in the bed of the pickup truck before he was carried over the side of the truck, Tr.2 at 162:18, Smith's counsel suggested that this was fabricated to bolster a civil suit that Warren had filed against Smith. RSA, at A13 (Tr.2 at 169:9-169:13).

The government then sought to rehabilitate Warren's testimony by introducing as a trial exhibit Warren's grand jury testimony from March 4, 2014. RSA, at A17 (Tr.2 at 173:1-173:4). In his grand jury testimony, Warren asserted that he was shackled. RSA, at A27. The government elicited from Warren at trial that the grand jury testimony was given prior to Warren's filing suit against Smith. RSA, at A16 (Tr.2 at 172:22-172:25). The government therefore offered the grand jury testimony "pursuant to the law that prior consistent statements are admissible to rebut charges of recent fabrication." RSA, at A17 (Tr.2 at 173:5-173:7). The district court admitted the grand jury testimony, stating that the "grand jury testimony is admissible to rebut an allegation or inference that Warren has fabricated his testimony because of his financial interest in a lawsuit." RSA, at A18 (Tr.2 at 174:18-174:20). Notably, Warren also testified that he "had talked to an attorney" before giving his grand jury testimony. RSA, at A16 (Tr.2 at 172:20-172:21).

### 3. *Denial of Smith's Rule 29 Motion for Judgment of Acquittal, Sentence, and Entry of Judgment*

On September 10, 2014, at the close of the government's case on the third day of trial, Smith's counsel made an oral Rule 29 motion for judgment of acquittal on all four counts charged. RSA, at A33, A35 (Tr.3 at 358:5-358:9, 360:23-360:25). In

so doing, Smith's counsel stated, "I don't believe that there's sufficient evidence to support an inference of intent to deprive [] Warren [or] Land [] of their civil rights. [T]he only evidence is that a force commensurate with the threat that was presented was used and a reasonable force commensurate to that threat in all four cases." RSA, at A33 (Tr.3 at 358:10-358:16). The court reserved decision on the Rule 29 motion, pursuant to Rule 29(b). RSA, at A35-A36 (Tr.3 at 360:25-361:1).

Near the end of the third day of trial, after Smith presented his case and the government presented its rebuttal witnesses, the district court took the Rule 29 motion under advisement. RSA, at A38 (Tr.3 at 475:12-475:22). On September 12, 2014, the jury returned a split verdict, acquitting Smith on counts 1 and 4 and convicting him on counts 2 and 3. Tr.5 at 577:16-578:23. On September 17, 2014, the court denied Smith's Rule 29 motion for judgment of acquittal on counts 2 and 3, the counts of conviction. RSA, at A40.

Thereafter, on December 4, 2014, the district court sentenced Smith to 14 months imprisonment on counts 2 and 3, to run concurrently. Sent.Tr. at 38:16-38:23. The court assessed a fine of $500, waiving interest, and imposed a supervised release term of two years for each count to run concurrently. Sent.Tr. at 38:24-38:25. The court also imposed special conditions: that Smith enter anger management overseen by the probation department, that he perform 80 hours of community service overseen by the probation department, and that he pay a special assessment of $200. Sent.Tr. at 39:1-40:13. Judgment was thereafter entered by the district court on December 12, 2014. RSA, at A41.

17

## IV.    <u>SUMMARY OF ARGUMENT</u>

Defendant–Appellant Smith's convictions on count 2 and count 3 of the indictment were both plagued by two errors that warrant their overturning, and count 2 was infected by a further error which requires its reversal.

*First*, the district court erred in admitting officer lay opinion testimony that Smith's conduct, performed as a police officer, was unreasonable and constituted excessive force.  Federal Rule of Evidence 701 states that admissible lay opinion testimony may not be based on "specialized knowledge within the scope of Rule 702 [which governs expert testimony]."  FED. R. EVID. 701(c).  Furthermore, Rule 701 avers that lay opinion testimony must be limited to opinions that are "rationally based on the *witness's* perception."  FED. R. EVID. 701(a) (emphasis added).  The testifying officers had not been disclosed or qualified as expert witnesses, yet they relied on their "specialized knowledge" as police officers in testifying about Smith's exercises of force.  In addition, many of these officers did not even witness Smith's exercises of force about which they testified and thus their testimony was not limited to opinions based on their *own* perception, as the rule requires.  This erroneously admitted testimony was key to the government's case and thus the district court's error warrants reversal of Smith's convictions on counts 2 and 3.

*Second*, the evidence presented in the government's case was insufficient to support the convictions on count 2 and count 3.  The government was required to prove beyond a reasonable doubt, separately for each count charged, that Smith subjected an individual to objectively unreasonable force and that Smith intended to subject the individual to unreasonable force.  On both counts, and on each of these

two elements, the evidence adduced at trial was insufficient for any reasonable jury to find these elements beyond a reasonable doubt. Thus, this Court should reverse Smith's convictions and both count 2 and count 3 and remand with instruction to enter a judgment of acquittal.

*Third*, with respect to count 2, the government violated Smith's Due Process rights in proffering and improperly rehabilitating the false testimony of Cletis Warren that, when Smith exercised force against him, he was already handcuffed and shackled. This was clearly false testimony, the government clearly knew that it was false testimony and never contended that it was true, and it was material to the charges against Smith on count 2 of the indictment. Thus, the government's violation warrants reversal of Smith's conviction on count 2.

In light of the second error, insufficiency of the evidence, this Court should direct entry of a judgment of acquittal for Smith on count 2 and count 3 of the indictment against him. Otherwise, this Court should reverse Smith's convictions on count 2 and count 3 and grant him a new trial.

## V.   ARGUMENT

### A.   The Admission of Officer Testimony That Smith's Conduct Was Unreasonable and Excessive Was Legal Error, Warranting Reversal of Smith's Convictions

The core of the government's case against Smith included testimony by many officers that Smith's conduct, performed as a police officer, was unreasonable and constituted excessive force. Specifically, Officer Troyer, Officer Boller, Officer Chadd, and Officer Hallam testified as such with respect to count 2; and Officer Biggs gave such testimony on count 3.

19

The officer testimony failed to adhere to the strictures of Federal Rule of Evidence 701 for two distinct reasons, considered separately below. *First*, though not one of these officers had been disclosed or qualified as an expert, the officers nevertheless provided expert testimony, relying on their expertise as police officers—their "specialized knowledge"—in opining about the reasonableness of Smith's conduct. *Second*, four of the officers did not even witness Smith's exercises of force against Warren and Land, and thus their testimony was not limited to opinions that were rationally based on their own perception.

Each officer's testimony was infected by one or both of these errors. Thus, the district court committed legal error in admitting the officer testimony that Smith's force was unreasonable. Furthermore, these errors cannot be categorized as harmless error: the improperly admitted officer testimony was key to the government's case. Consequently, these errors warrant reversal of the convictions against Smith.

### 1.  *Standard of Review and Legal Framework*

The standard of review by the Court of Appeals of the district court's evidentiary rulings is for abuse of discretion. *United States v. Isaacs*, 593 F.3d 517, 527 (7th Cir. 2010); *see also United States v. de Soto*, 885 F.2d 354, 359-60 (1989) (setting out abuse of discretion standard for the admission of expert testimony and cautioning that appellate courts "always must be mindful of the context in which an evidentiary decision is made" and that "[w]hen the litigation context presents circumstances particularly susceptible to abuse, [the appellate court] must be especially alert to the possibility of prejudice"). "The district court abuses its

discretion when it makes an error of law or when it makes a clearly erroneous finding of fact." *United States v. Silva*, 140 F.3d 1098, 1101 n.4 (7th Cir. 1998). An error of law is by definition an abuse of discretion. *United States v. Rea-Beltran*, 457 F.3d 695, 702 (7th Cir. 2006).

Moreover, the usual deference for evidentiary rulings "does not apply when a district court incorrectly categorizes the nature of the evidence." *United States v. Manske*, 186 F.3d 770, 776 (1999). "The district court's classification of a witness as lay or expert is a legal interpretation that [the Court of Appeals] review[s] de novo." *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion S.A. v. Titan Int'l, Inc.*, 533 F.3d 555, 559 (7th Cir. 2008).

If this Court determines that the district court committed legal or factual error or otherwise abused its discretion, the Court applies harmless error analysis to determine if the error warrants reversal of the convictions. *United States v. Cooper*, 591 F.3d 582, 590 (7th Cir. 2010) ("Evidentiary errors are subject to harmless error analysis under FED. R. CRIM. P. 52(a)."). With respect to evidentiary questions, this Court has held that "[t]he test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *Id.* (alteration in original). The government bears the burden in showing that an error was harmless. *United States v. Mansoori*, 480 F.3d 514, 523 (7th Cir. 2007).

As the officers testified as lay opinion witnesses, Rule 701 of the Federal

Rules of Evidence governs the admissibility of their testimony.  It states:

> If a witness is not testifying as an expert, testimony in the form of an opinion
> is limited to one that is:
>> (a) rationally based on the witness's perception;
>> (b) helpful to clearly understanding the witness's testimony or to
>> determining a fact in issue; and
>> (c) not based on scientific, technical, or other specialized knowledge
>> within the scope of Rule 702 [which governs expert testimony].

FED. R. EVID. 701.  As discussed below, the officer testimony failed to adhere to the

requirements set forth in Rule 701.  *Id.*

### 2.     *The Officers' Testimony Constituted Improper Expert Testimony Wrongfully Admitted as Lay Opinion Testimony in Contravention of Rule 701(c)*

Here, the threshold inquiry is whether the district court mischaracterized the

officers' testimony that Smith's force was unreasonable or excessive as lay opinion

testimony, and that question is reviewed *de novo.  Titan Int'l, Inc.*, 533 F.3d at 559;

*Tribble v. Evangelides*, 670 F.3d 753, 758-59 (7th Cir. 2012) (reviewing *de novo*

whether assistant state's attorney's testimony was "expert testimony subject to the

constraints of [Federal Rule of Evidence] 702" (alteration in original)).  Rule 701

and applicable Seventh Circuit case law makes plain that the officer testimony here

did not meet the requirements for lay opinion testimony.

As Rule 701 states, lay opinion testimony may not be "based on scientific,

technical, or other specialized knowledge within the scope of Rule 702."  FED. R.

EVID. 701(c).  In analyzing the difference between Rules 701 lay opinion testimony

and 702 expert testimony, this Court has taught that for "[l]ay opinion testimony [to

be] admissible [it must] help the jury or the court to understand the facts about

22

which the witness is testifying"; it is "*not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events.*"  *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002) (emphasis added); *see also United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013) (stating that "lay opinion must be the product of reasoning processes familiar to the average person in everyday life").  Specifically with respect to officer testimony, the Court has stated that "an officer testifies as an expert when he brings 'the wealth of his experience as [an] officer to bear on those observations and ma[kes] connections for the jury based on that specialized knowledge.'"  *United States v. Christian*, 673 F.3d 702, 709 (7th Cir. 2012) (internal citations omitted); *see also Haynes*, 729 F.3d at 195 (holding, in drug smuggling case, that border patrol officer's testimony about operation of gas tank filled with drugs was inadmissible as lay opinion testimony, as Rule 701 does "not permit a law enforcement agent to testify to an opinion so based and formed if the agent's reasoning process depended, in whole or in part, on [the agent's] specialized training and experience").  "[T]he district court [is required] to act as an evidentiary gatekeeper, ensuring that Rule 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to hear the testimony of a proffered expert."  *United States v. Lupton*, 620 F.3d 790, 798 (7th Cir. 2010); *see also United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001) ("What is essentially expert testimony [] may not be admitted under the guise of lay opinions.  Such a substitution subverts … the reliability requirements for expert testimony….").

Both Officer Chadd and Officer Hallam explicitly relied on their police training in concluding that the force was excessive. Officer Chadd testified that he believed that Smith's exercise of force against Warren was unreasonable. Tr.1 at 127:9-127:13. In justifying this conclusion, Officer Chadd, invoking his "training as a deputy and as a police officer," opined that an officer is only allowed to strike someone in the head with a "closed fist" in a "deadly force situation, fighting for your life," and he proceeded to give examples of such deadly force situations. Tr.1 at 126:17-126:23, 127:24-128:1. Officer Hallam testified that Smith's use of force against Warren was unreasonable. Tr.2 at 151:24-152:1. Though he initially stated that he was not trained on when it was permissible to punch someone, he nonetheless proceeded to testify that "if you were to punch somebody in the face or anywhere else outside of what we're normally trained to do [that] would be almost lethal force." Tr.2 at 151:19-151:23.

The officers' testimony that, *according to their police training*, a punch to the face was tantamount to lethal force and that such a punch may only be used in response to the endangerment of one's life was plainly based on "specialized training." *United States v. Fenzl*, 670 F.3d 778, 782 (7th Cir. 2012) (internal quotations omitted) (holding that, in investigation of fraud relating to bidding for a city waste-management contract, testimony of investigator, which was based on the investigator's "training and experience," about how city would acted had they known about defendant's bidding conduct was not admissible as lay opinion testimony); *see also Kladis v. Brezek*, 823 F.2d 1014, 1019 (7th Cir. 1987)

24

(approving district court's admission of testimony "as to the proper level of force to be used by police in various situations" by properly qualified police expert, who "testified as to his credentials and informed the court that he frequently instructs police officers in the proper use of force"). In their supposedly lay opinion testimony, the officers were drawing on their training and experience, and thus relying on specialized knowledge outside what is "accessible to ordinary persons." *United States v. Jones*, 739 F.3d 364, 369 (7th Cir. 2014) (holding that, in a case concerning a bank robbery defendant, lay opinion testimony of investigating officer including detailed facts about dye packs was based on "technical, specialized knowledge obtained in the course of his position," "was not based on personal observations accessible to ordinary persons," and was therefore expert testimony within Rule 702). Indeed, that a punch to the face always constitutes lethal force and that an officer may only use a punch to the face in response to life threatening situations are certainly not common knowledge.

Based on this specialized knowledge, the officers were providing a specialized interpretation of the events that was inaccessible to the "untrained layman." *Conn*, 297 F.3d at 554. Thus, under Seventh Circuit' precedent, this was expert testimony and would only have been admissible if the government had met the requirements for disclosing and qualifying these officers as experts. *Christian*, 673 F.3d at 709 (holding that officer who testified, based on his experiences encountering armed subjects, about defendant's hand movements and consequent likelihood that defendant possessed a gun, testified as an expert); *see also Tribble*, 670 F.3d at 758-

59 (explaining that witness, who "summarize[ed] her experiences" and used her specialized knowledge to "guide[] the jury to a conclusion," testified in an expert capacity).

Although the other three officers did not explicitly discuss their "training," the jury would have understood their testimony, in the context of the trial record, to be similarly "based on … specialized knowledge." FED. R. EVID. 701(c). Officer Troyer, Officer Boller, and Officer Biggs were asked *as police officers* to give their opinions on Smith's conduct, and the government emphasized that fact in arguing that all of the officers relied on their professional expertise and training. For example, the government in closing summarized the testimony of the officers as to the reasonableness of Smith's force by stating, "*They were all trained in use of force. They all stated that T.J. Smith used excessive force….*" Tr.4 at 486:19-486:25 (emphasis added) (referencing officer witnesses concerning count 2). Moreover, the government repeatedly underscored that it was police officers testifying against Smith. Tr.1 at 17:23-18:1 ("Those *police officers* are going to testify about what they saw, what they heard; and they're going to give their opinion about whether they believe that Deputy Smith used excessive force or not.") (emphasis added); Tr.4. at 501:20-501:25 ("All their *officers* who were there acted reasonably and restrained their use of force … and testified that this defendant's use of force was excessive.") (emphasis added); 547:2-547:4 ("Here's the big picture, ladies and gentlemen, of the jury. Seven *police officers* have testified that Terry Smith's use of force was excessive.") (emphasis added). On this record, the jury would have understood that,

by testifying as police officers about the propriety of another police officer's on-duty conduct, all of these officers were "bring[ing] 'the wealth of [their] experience as officer[s] to bear on [their] observations and ma[king] connections for the jury based on that specialized knowledge.'" *Christian*, 673 F.3d at 709 (internal citations omitted); *see also Peoples*, 250 F.3d at 642 ("[T]he jury may well have been inclined to give [the agent's] conclusions undue weight because of her status as an FBI agent. Despite the fact that the court did not qualify her as an expert, [the agent] was identified as a law enforcement officer, and we cannot rule out the possibility that the jurors may have been inclined to substitute her conclusions … for their own."). Thus, each of the officers was testifying as an expert, and the district court erred in admitting this testimony without subjecting the officers' testimony to the strictures and procedures attending Rule 702.[5] *Lupton*, 620 F.3d at 798.[6]

Nor was the district court's admission of this officer testimony harmless error. An error is harmless only if, in the mind of the average juror, the prosecution's case would not have been "significantly less persuasive had the

---

[5] As discussed, the government did not disclose these officers as expert witnesses, and therefore they had not been qualified by the district court as experts according to the procedures of Rule 702. Furthermore, other than the officers' bare references to their position and training in their testimony, the government did not introduce into the record any information about the qualifications of these officers to provide expert testimony on the unreasonableness of force.

[6] Moreover, this officer testimony, even as lay opinion testimony, was inadmissible for another reason. The testimony offered a legal conclusion about the unreasonableness and excessiveness of Smith's exercises of force, and thus was unhelpful to the jury, in contravention of Fed. R. Evid. 701(b). *United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009) ("We have held repeatedly that lay testimony offering a legal conclusion is inadmissible because it is not helpful to the jury, as required by Rule 701(b). … This is because a lay witness's purpose is to inform the jury what is in the evidence, not to tell it what inferences to draw from that evidence.").

improper evidence been excluded." *Cooper*, 591 F.3d at 590. Here, the officer testimony that Smith's conduct was unreasonable was key to the government's case. In its opening statement outlining the evidence to be presented against Smith, the government highlighted this officer testimony on the reasonableness of Smith's force. Tr.1 at 17:23-18:1 ("Those police officers are going to testify about … whether they believe that Deputy Smith used excessive force or not."). And the government repeatedly stressed the testimony in its closing statement. Tr.4 at 486:19-486:25 ("There were four officers on the scene [of count 2] who gave their opinion as to whether or not that punch was reasonable. These were not random witnesses. They were all individuals that were present and saw the events as they played out. They were all trained in use of force. They all stated that T.J. Smith used excessive force…."); 501:24-501:25 ("In the Cletis Warren incident, [the other officers] all restrained their own use of force and testified that this defendant's use of force was excessive."); 547:2-547:4 ("Here's the big picture, ladies and gentlemen, of the jury. Seven police officers have testified that Terry Smith's use of force was excessive.").

As discussed below,[7] even with this officer testimony, the government's case against Smith was a thin reed, unable to sustain the convictions. Without the officer testimony that Smith's conduct was unreasonable or excessive—which the government continually referenced—the government's case against Smith would have been "significantly less persuasive."

---

[7] *See infra* Section V.B.

### 3. *The Officers' Conclusions That Smith's Exercises of Force Were Unreasonable Were Not Limited to Opinions Based on Their Own Perception and Therefore Violated Rule 701(a)*

Rule 701 states that in order to be admitted as lay opinion testimony, the testimony must be "rationally based on *the witness's* perception." FED. R. EVID. 701(a) (emphasis added). "[A] lay witness's testimony is rationally based within the meaning of Rule 701 where it is based upon *personal* observation and recollection of concrete facts." *United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005) (internal citations omitted and emphasis added); *see also United States v. Jackson*, 688 F.2d 1121, 1124 (7th Cir. 1982); *Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993) ("Under the Federal Rules of Evidence, speculative opinion testimony by lay witnesses—*i.e.*, testimony not based upon the witness's perception—is generally considered inadmissible.").

The officers' own testimony reveals a clear failure to adhere to Rule 701's requirement that testimony be "rationally based on *the witness's* perceptions." FED. R. EVID. 701(a) (emphasis added). Specifically, four of these officer witnesses did *not see* the exercises of force which they concluded were unreasonable. Instead, their testimony was informed by relying upon other fact witness's statements.

With respect to count 3, Officer Biggs testified that he saw Land "in the air[,] horizontal to the ground," and afterwards saw Smith drop his knee onto Land. Tr.2 at 237:13-237:24. Critically, though, Biggs testified that he did not see what transpired beforehand. Tr.2 at 237:20-237:24. Thus, Biggs did not see what precipitated Smith's use of force—as far Biggs knew, Land could have attempted to assault Smith, for example, by ramming or head-butting him. Biggs' opinion thus

rested dispositively upon the statements of others about what preceded Smith's application of force.  Moreover, Biggs did not see Smith throw Land to the ground.  Nevertheless, Biggs testified that Smith's force—that is, Smith "*throwing [Land] to the ground* and driving his knee into his back or sternum"—was unreasonable.  Tr.2 at 239:23-240:10.  Even with respect to what Biggs did see, his perception was admittedly shaky: he testified that Land was thrown on his back to the ground and that Smith placed his knee on Land's sternum, while Land and Leathers testified that Land fell face first and that Smith's knee was on Land's back.  Tr.2 at 216:20-216:21, 330:15-330:16, 237:25-238:2.  The government sought to address this discrepancy by specifically eliciting from Biggs his opinion that Smith's application of his knee was unreasonable regardless of whether it was applied into Land's "back or sternum."  Tr.2 at 240:7-240:10.

As Biggs did not witness many of the critical events, his testimony was *unavoidably* informed by, and based on, the other fact witness's claims as to what happened.  But such testimony is not based on Biggs's *own perceptions*—as Rule 701(a) requires.  *See Peoples*, 250 F.3d 630, 641 (holding that agent's testimony about the meaning of recorded conversations of defendant was not admissible as lay opinion testimony under Rule 701 as the agent "lacked first-hand knowledge of the matters about which she testified" and "[h]er opinions were based on her investigation after the fact, not on her perception of the facts").[8]

---

[8]  Indeed, the government objected to Smith's counsel's questioning of Sheriff Fenwick on the same basis.  Tr.3 at 365:2-366:18.  The government argued that Sheriff Fenwick, who admitted to not perceiving the events, could not give opinion testimony on the events of count 2 as he had not been qualified or disclosed as an expert and would be testifying based

Furthermore, Biggs did not perceive important information that was essential to evaluating the reasonableness of Smith's force. As discussed, Biggs did not see what precipitated Smith's use of force, the actual maneuver Smith used in bringing Land to the ground, or how Land's own responsive movements contributed to his fall. As discussed, for all Biggs knew, Land might have physically instigated Smith. Without this information, Biggs's conclusion that Smith's force was unreasonable was not *rationally based* on his *own* perceptions. It was an opinion that was improperly premised on the sum total of the observations of all of the witnesses.

A comparable error occurred with respect to count 2. In their respective testimony with respect to count 2, Officer Troyer, Officer Boller, and Officer Chadd admitted that they did not see Smith punch Warren. Tr.1 at 35:19-35:24, 98:17-98:18, 119:8-119:23. Instead, Troyer heard a "pop," which he likened to a "tomato hitting a wall." Tr.1 at 35:25-36:3. Boller echoed the exact same "tomato" analogy. Tr.1 at 98:15-98:16. And Chadd heard a "skin-on-skin smack." Tr.1 at 119:17-119:20. Indeed, they all testified that they only learned that Smith punched Warren because of others' statements they subsequently overheard. Tr.1 at 38:9-38:16, 98:19-98:20, 120:7-120:19. Yet they all testified that Smith's punching Warren was unreasonable or excessive.

---

(footnote continued)

on others' statements. The court agreed with the government and limited Smith's counsel's questioning as such. Tr.3 at 366:14-367:17.

Just as with Biggs, the testimony of Troyer, Boller, and Chadd was filled in with the other fact witnesses' testimony. They admit that they did not even know Smith punched Warren until they were told. Indeed, though he did not see it, Chadd simply assumed that Smith used a closed fist in drawing his conclusion that Smith's force was unreasonable. Tr.1 at 126:17-126:23, 127:9-127:16. In contravention of Rule 701(a), these officers did not limit their testimony to opinions based only on their own perceptions.

Further, as with Biggs, in failing to see Smith's exercise of force, these officers did not personally perceive information critical to assessing the reasonableness of Smith's force. For example, they did not see how Smith's hand was positioned—as a closed fist, open hand, back hand, with knuckles protruding, or in some other fashion—or even where in the face Warren was actually punched. The officers could not perceive any of these important facts, and thus their conclusions were not *rationally based* on their *own* perceptions.

The fact that Troyer, Boller, and Chadd heard "smack[s]" and "pop[s]" does not alter this conclusion. Such auditory perceptions of the punch were plainly inadequate to rationally justify the conclusion that Smith's force was unreasonable or excessive, as those sounds would not provide the officers with the critical information discussed above. At best, these sounds merely indicate that Smith applied some physical force to Warren—and, by the officers' own admissions, these officers did not learn that Smith had applied that force to Warren based on these sounds.

32

The officers' testimony is analogous to the testimony held inadmissible in *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006). That case also involved excessive force claims against an officer. A motorist, who was stopped for a traffic violation, fled from the police. The defendant, an off-duty officer, arrived at the scene once the motorist had been apprehended. The motorist was lying motionless on the ground, and the defendant proceeded to kick him a number of times. *Id.* at 152-53. At trial, the defendant argued that his kicks were reasonable under the circumstances. *Id.* at 153. In response, the government offered opinion testimony from several officers regarding the reasonableness of the defendant's use of force. *Id.* at 153. The Fourth Circuit held that some of the officers' testimony was inadmissible under Rule 701, as those officers had not observed the defendant's use of force on the motorist and their opinions on the defendant's use of force were based on second-hand accounts. *Id.* at 156. This is precisely what occurred here. These officers did not witness Smith's exercises of force, instead they testified based on details from other witness's accounts.

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002), also teaches that the admission of this testimony violated Rule 701(a). In that case, a witness testified that the defendant had been carrying a gun. *Id.* at 67. This was based on the witness's perception of a small bulge in defendant's figure, from "a distance of about five or six houses" away. *Id.* The Second Circuit held that the witness's testimony was not admissible under Rule 701, as the witness's conclusion was based on the witness's perception of a small bulge from relatively far away and thus did not

constitute "first-hand knowledge or observation." *Id.* (internal citations omitted). Here, there was an analogous failure in the officers' ability to perceive Smith's exercises of force, for the officers did not even see Smith's exercise of force. Thus, the testimony of these officers should not have been admitted as lay opinion testimony.

The improper admission of the officer testimony on this basis was also not harmless error. On count 3, Officer Biggs's testimony was the only officer who testified that Smith's force was excessive. Thus, without his testimony, the government's case on count 3 would be "significantly less persuasive." On count 2, three of the four officers who testified as to the reasonableness of Smith's exercise of force did not witness that exercise of force. But the government relied on the fact that there were a number of officers testifying that Smith's exercise of force was unreasonable. *See, e.g.*, Tr.4 at 486:19-486:25 ("There were four officers on the scene [of count 2] who gave their opinion as to whether or not that punch was reasonable."). Without the testimony of these three officers, the government would have had to rely on only one officer's testimony (which itself was expert testimony improperly admitted as lay opinion testimony[9]), and, consequently, the government's case on count 2 would be "significantly less persuasive."

### B.    The Evidence Adduced at Trial Was Insufficient to Sustain the Convictions on Counts 2 and 3

The government's case contained insufficient evidence to sustain Smith's convictions on counts 2 and 3. In particular, the government needed to prove

---

[9]  *See supra* Subsection V.A.2.

beyond a reasonable doubt, separately for each count charged, that, in the course of his duties as a police officer, Smith subjected an individual to objectively unreasonable force and intended to subject the individual to objectively unreasonable force.  18 U.S.C. § 242.  On both counts, the evidence adduced at trial was insufficient for any reasonable jury to find these elements beyond a reasonable doubt.  Thus, this Court should reverse Smith's convictions and remand to the district court with instructions to acquit Smith of the charges on both count 2 and count 3.

### 1.    *Standard of Review and Legal Framework*

Smith's arguments on insufficiency of the evidence were fully preserved for review by this Court.[10]  When a defendant challenges the sufficiency of the evidence, this Court analyzes whether, viewing the facts in the light most favorable to the government, "a rational trier of fact could have found from the evidence and inferences drawn therefrom that the defendant was guilty beyond a reasonable doubt."  *United States v. Brooks*, 748 F.2d 1199, 1202 (7th Cir. 1984).

As Smith made his Rule 29 motion at the close of the government's case, and the district court reserved its decision at that time, Smith's Rule 29 motion should have been decided based only on the evidence in the government's case.  FED. R. CRIM. P. 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.").  This Court is reviewing that decision and therefore should also only consider the evidence in the government's

---

[10]  *See supra* Subsection III.C.3.

case. *See United States v. Truong*, 425 F.3d 1282, 1288 (10th Cir. 2005) (citing Advisory Committee Notes to 1994 Amendments ("[T]he trial court is to consider only the evidence submitted at the time of the motion in making its ruling, whenever made. And in reviewing a trial court's ruling, the appellate court would be similarly limited.")).

"In unreasonable or excessive use of force cases, jurors must determine whether the use of force was reasonable by using the 'objective reasonableness' standard; that is, by evaluating the situation from the viewpoint of 'a reasonable officer on the scene.'" *United States v. Brown*, 250 F.3d 580, 586 (7th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 388, 395-96 (1989)). "That test 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *United States v. DiSantis*, 565 F.3d 354, 363 (7th Cir. 2009) (citing *Graham*, 490 U.S. at 396). Moreover, in the Supreme Court's words, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

To show the intent element of 18 U.S.C. § 242, "the government must establish that the defendant acted 'in open defiance or in reckless disregard of a constitutional requirement.' … Willfulness may be shown by circumstantial

evidence so long as the purpose may 'be reasonably inferred from all the circumstances attendant on the act.'" *United States v. Bradley*, 196 F.3d 762, 769 (7th Cir. 1999) (quoting *Screws v. United States*, 325 U.S. 91, 105-06 (1945)).

### 2.    *The Insufficiency of the Evidence on Count 2 and Count 3*

As Smith's insufficiency claims are specific to the facts of each count, they are considered separately below.

#### a.    *Count 2*

Even drawing all inferences in the government's favor, no reasonable jury could have found, beyond a reasonable doubt, that Smith's force in punching Warren was objectively unreasonable or excessive.[11]  Smith was acting against an individual who was a known methamphetamine addict, fled from the police, collided with an officer's vehicle, was viewed as a continuing flight risk, would not submit hands for handcuffing, had to be picked up and carried by officers, and was "flailing a little bit" when detained by the officers.  Tr.1 at 35:5-35:6.  Warren was not cooperative and he posed a number of continuing risks.  Most significantly, when passed from the pickup by Officer Troyer and Officer Boller, Warren was not

---

[11]  In assessing the sufficiency of the evidence on count 2, the Court should disregard Warren's false testimony that he was handcuffed and shackled when punched by Smith— testimony that the government itself never contended was true.  *United States v. Johnson*, 729 F.3d 710, 715 (7th Cir. 2013) (holding that, on review for insufficiency of the evidence, the Court will set aside testimony that is "exceedingly improbable").  Moreover, as discussed below, this false testimony should never even have been presented by the government.  *See infra* Subsection V.C.2.  However, even if Warren's testimony were credited, the evidence would still be insufficient to sustain the conviction, as there was no evidence whatsoever that Smith believed that Warren was handcuffed or shackled, and indeed, as the government itself recognized, the evidence indicates that Smith did not believe that Warren was handcuffed or shackled.  *See, e.g.*, Tr.4 at 483:22-483:25 ("He came out of nowhere and punched him [Warren] in the face…. He didn't attempt to try to handcuff him.").

handcuffed, was facing upwards, and had been flailing. Warren could have potentially, in a sudden burst, outstretched his arms or swung his hands and hurt an officer.

It is not enough that the other officers testified at trial that, in their view, Warren was under control and, thus, that in their view Smith's force was unreasonable and excessive. The test to employ is not one of perfect knowledge or perfect judgment—it is not an *ex post* inquiry benefitting from 20/20 hindsight. *Graham*, 490 U.S. at 396; *Brown*, 250 F.3d at 586. Rather it is an objective test, based on what a reasonable officer would have perceived, taking into consideration the fact and circumstances. Here, even viewing the evidence in the light most favorable to the government, Smith made a split-second judgment to apply additional force in a tense, frenetic situation. Smith's exercise of force was immediately followed by Warren's being handcuffed and apprehended. The force that Smith exercised against an uncooperative Warren was thus objectively reasonable, given the tense and uncertain circumstances.

Though this Court's review of claims of insufficiency of the evidence is deferential, the Court must still determine that "a rational trier of fact could have found from the evidence and inferences drawn therefrom that the defendant was guilty *beyond a reasonable doubt*." *Brooks*, 748 F.2d at 1202 (emphasis added). In light of the facts discussed above, no reasonable jury could have found beyond a reasonable doubt that Smith's exercise of force was objectively unreasonable.

The insufficiency is all the more pronounced with respect to the intent element of the offense. The government's purported evidence proving Smith's intent to subject Warren to what he knew to be unreasonable force was slim to none.

The government's case primarily relies on the nature of Smith's force—namely, punching Warren in the face. Apart from that, the government points to Smith's conduct subsequent to the punching as somehow indicating Smith's wrongful intent during the offense. In particular, the government proffered that Smith insulted other officers because they would not have punched Warren; that Smith was bragging and proud of punching Warren; and that Smith thought Warren deserved the punch. Tr.1 at 44:16-44:22, 133:13-133:14, 100:15-100:17; Tr.2 at 186:7-186:8, 152:13. Finally, the government also offered evidence that, though Smith possessed (and assertedly watched with pride) a video of the incident from his vehicle's dash camera, that video was not later recovered. The government speculated that Smith did not preserve the video and that this was because he thought the video was incriminating. Tr.4 at 486:6-486:12.

Intent is a separate element of the crime and must be independently proven. 18 U.S.C. § 242; *Morissette v. United States*, 342 U.S. 246, 274-75 (1952). Though "the nature and degree of force used by the defendant" may be considered in assessing the defendant's intent, it is "[o]ne factor" to consider in that determination. *Bradley*, 196 F.3d at 769-70 (approving a jury instruction on the intent element of 18 U.S.C. § 242). Intent cannot be automatically presumed based only on the showing of conduct purportedly intended. *Morissette*, 342 U.S. at 274-

75 (holding that "a presumption of intent from an act" would "conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime").

As discussed, the nature and degree of the force was not unreasonable; but, even if it were, it alone would be insufficient to prove the requisite intent element. It cannot be said a reasonable jury would have found, beyond a reasonable doubt, that an officer must have believed that such an application of force to Warren was objectively unreasonable, under the circumstances. Moreover, the other supposed proof of intent adds nothing. That Smith chastised others for not being willing to exercise the same kind of force, that he was proud of his conduct, and that he believed Warren deserved to be punched do not in any way show that Smith intended to subject Warren to unreasonable force "'in open defiance or in reckless disregard of a constitutional requirement.'" *Bradley*, 196 F.3d at 769. Quite the opposite, it shows that Smith subjectively believed that his exercise of force was reasonable, appropriate, and justified. The government was required to prove, beyond a reasonable doubt, that Smith *knew* that his force was excessive. It simply failed to do so.

Finally, the government engages in gross speculation that Smith wished to hide his conduct by supposedly destroying an incriminating video. The government seeks to derive this unreasonable inference from two items of evidence, neither of which is sufficient to permit the sinister inference the government sought to draw.

First, the government's wholly speculative conjecture that the video was incriminating was based on the testimony of a single officer, Downing, who said that Smith showed his dash-camera video to a group of a "half-dozen" officers and members of the "jail staff." Tr.2 at 207:3-207:25. Notably, however, Officer Downing testified that, at the point in the video when the officers got into the back of the pickup, the other persons watching outside Smith's vehicle "converged on the window," and he was "pushed back" and did *not* see the remainder of the video. Tr.2 at 207:17-208:3. He said only that some persons viewing the remainder of the tape said, "wow." Tr.2 at 208:12. The government thus had *no* evidence as to the content of this video, and it conspicuously failed to call any of the supposedly half-dozen persons who did see it. Instead, the government improperly invited the jury to rely on rank speculation about the video's contents.

Second, the government emphasized that Deputy Helmer was later unable to recover this video from Smith's vehicle. But Helmer was unable to recover the dash-camera videos from the vehicles of Deputy Troyer, Deputy Smith, or Deputy Chadd; Helmer was only able to recover the video from Deputy Boller's vehicle. Thus, the mere fact that the tape was later no longer available does not support a reasonable inference that Smith was intending to cover up his conduct.

But even drawing the speculative inferences that the government wanted, it would not establish the element of *intent*. Even assuming *arguendo* that Smith was *later* embarrassed about his conduct or wished to conceal it for fear of repercussions does not indicate that, *at the time he punched Warren*, he *intended* to subject

41

Warren to unreasonable force.  Taking into account all of the circumstances in the light most favorable to the government, no reasonable jury could conclude beyond a reasonable doubt that Smith exercised force against Warren "in open defiance or in reckless disregard" of Warren's rights.  *Bradley*, 196 F.3d at 769.

The encounter with Warren was an adrenaline-filled situation:  it involved a known methamphetamine user fleeing apprehension, colliding into a police vehicle, failing to comply with police orders, and flailing while being detained by police officers.  Even assuming that, in ultimately apprehending Warren, Smith exercised significant force against Warren, this is itself not criminal.  The government was required to show, beyond any reasonable doubt, that Smith subjected Warren to objectively unreasonable force and intended to subject Warren to that unreasonable force.  On the evidence adduced at trial, drawing all inferences in the government's favor, no reasonable jury could so find.

### b.    *Count 3*

Similarly, even in the light most favorable to the government, no reasonable jury could have found, beyond a reasonable doubt, that Smith's force in throwing Land to the ground and putting his knee on Land's person was unreasonable.  Land was arrested for an act of violence against another person.  He had been drinking significantly, he was obviously inebriated, and he did not comply with Smith's orders to stand facing the patrol car.  Instead, he repeatedly turned around to face Smith.  In facing Smith, he posed a potential physical danger to Smith; for example, he could have head-butted or rammed Smith.

42

Moreover, the evidence demonstrates that the nature and degree of Smith's force was not unreasonable. Though an ambulance was on site, Land was taken directly to jail without needing medical treatment, and thus his injuries were unquestionably not significant. And, though there was testimony that Land defecated as a result of Smith placing his knee in Land's back, this fact does not establish unreasonable force in the context of a person, such as Land, who was intoxicated. There was only one officer who testified that Smith's use of force was unreasonable, but as discussed above he did not even see Smith's exercise of force against Land and thus his testimony was without foundation.[12] In light of the factual considerations discussed, the government's case was insufficient to show the requisite element of unreasonable force.

Just as with count 2, the government's case is all the more deficient on the element of intent. Apart from the force exercised, the government primarily relied on Smith's subsequent boast at the jail that it "wasn't the first time that he's made somebody defecate himself." Tr.2 at 239:11-239:20. The government also proffered evidence that Smith supposedly taunted Land during the incident. Assuming Land's version of the story, Smith said to him, "You're not such a tough guy." Tr.2 at 217:1-217:4.

As discussed above, the nature and degree of Smith's exercise of force was not unreasonable; however, even if it were, given the circumstances, the force was not so drastic that a reasonable jury could have found, beyond a reasonable doubt, that

---

[12] *See supra* Subsection V.A.3.

an officer must have believed it was unreasonable.  Also, the fact that Smith was supposedly proud of his exercise of force does not show that he thought it was unreasonable or that he intended to subject Land to unreasonable force.  On the contrary, it suggests that Smith thought, rightly or wrongly, that his application of force was not unreasonable.  Finally, the alleged taunting is also not evidence that Smith intended to subject Land to unreasonable force.  The content of the supposed taunting—telling Land that he was "not such a tough guy"—is in no way inconsistent with Smith believing the force exercised to be reasonable and appropriate given Land's noncompliance with Smith's orders and the consequent danger Land potentially posed to Smith.  No jury could reasonably infer from this meager evidence that Smith intended to subject Land to unreasonable or excessive force.

When Smith confronted Land, he was faced with a violent offender, who was intoxicated, was noncompliant, and posed potential physical dangers to Smith. Smith exercised force to neutralize these threats and thereby gained the required compliance from the arrestee Land.  Even in the light most favorable to the government, the evidence presented in the government's case was simply insufficient for any reasonable jury to find that Smith subjected Land to objectively unreasonable force and that Smith intended to subject Land to that unreasonable force.

**C.    The Government's Use of Warren's False Testimony Was Improper and Warrants Reversal of Smith's Conviction on Count 2**

In the course of his testimony, Cletis Warren falsely testified that, while in the bed of the pickup truck prior to being punched by Smith, Officer Boller and Officer Troyer had handcuffed and shackled him.  The government itself did not believe that this statement was true, and it violated Smith's Due Process rights in knowingly proffering this false testimony.  The government compounded this violation by rehabilitating Warren's testimony, after Smith's counsel's cross-examination, with Warren's grand jury testimony in which he similarly testified falsely.  This conduct was plainly erroneous and warrants reversal of Smith's conviction on count 2.[13]

### 1.    *Legal Framework and Standard of Review*

It is clearly established that a prosecutor's knowing use of false testimony violates the Due Process Clause.  *United States v. Agurs*, 427 U.S. 97, 103 & n.8 (1976); *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942); *Mooney v. Holohan*, 294 U.S. 103, 110 (1935) (per curiam); *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995).  The Supreme Court has taught that the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice[,]" and that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal citations omitted).  This Court has averred that false testimony is not to be narrowly

---

[13] *See supra* Section III.C.2.

45

construed; indeed, it even includes statements that, though "could be true in a limited, literal sense[,] give a false impression to the jury." *United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011).

When the defendant alleges that the government used false testimony in violation of his Due Process rights, to warrant reversal of the conviction, the defendant must establish that: (1) the government's case included false testimony; (2) the government knew or should have known of the false testimony; and (3) "there is a likelihood that the false testimony affected the judgment of the jury." *Freeman*, 650 F.3d at 680. On the second element, a defendant need not prove beyond a reasonable doubt that the witness's testimony was "knowingly false (and hence perjury)"; it is enough that the defendant show that the *prosecutor knew* the testimony to be false. *Boyd*, 55 F.3d at 243; *see also Freeman*, 650 F.3d at 680. Regarding the third element of prejudice, this Court has stated that "[t]his standard is much friendlier for defendants and 'sets a lower threshold for determining materiality.' The diminished burden reflects the fact that the knowing use of false testimony corrupts 'the truth-seeking function of the trial process.'" *Freeman*, 650 F.3d at 681 (internal citations omitted).

As this was not raised before the district court, the Court of Appeals reviews for plain error, under Rule 52(b). FED. R. CRIM. P. 52(b); *United States v. Jaimes-Jaimes*, 406 F.3d 845, 847 (7th Cir. 2005). There are three requirements in showing a plain error: First, there must be an "error." Second, the error must be "plain," a term synonymous with clear or, equivalently, obvious. Third, the plain error must

affect "substantial rights"—that is, the error was prejudicial or affected the outcome of the district court proceedings. *United States v. Olano*, 507 U.S. 725, 734 (1993); *see also Jaimes-Jaimes*, 406 F.3d at 849.

If these conditions are met, then the Court of Appeals has discretion to correct the error. In exercising this discretion, the Supreme Court has taught that Courts of Appeals should exercise this discretion if the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 732 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

**2.    *The Government's Use of Warren's False Testimony Constituted Error***

The three elements required to show that the government violated Smith's Due Process rights by using false testimony are clearly present here.

*First*, Warren's testimony was false. Contrary to Warren's utterly implausible testimony that two officers somehow managed to handcuff and shackle him while he was still resisting arrest in the bed of the pickup truck, all the testifying officers who were at the scene stated that Warren was *not* handcuffed by Officer Troyer and Officer Boller prior to being punched. Tr.1 at 34:10-34:19, 98:8-98:11, 120:20-120:24; Tr.2 at 148:14-148:17. Indeed, Warren had an obvious financial motivation to lie about this point, as he had a civil suit pending against Smith when he testified. Tr.2 at 169:9-169:14.

*Second*, the government knew or should have known that Warren's testimony was false. Indeed, the government itself noted in both its opening and closing arguments that Warren was *not* handcuffed in the bed of the pickup truck, prior to

being punched by Smith.  Tr.1 at 11:2-11:7 ("Mr. Warren lies face down in the truck and surrenders.  One of the deputies grabs him by his upper body, another one by his legs and they lower him over the side of the pickup truck to three deputies who are down below so that those deputies who are down below can handcuff him."); Tr.4 at 483:22-483:25 ("[Smith] punched him [Warren] in the face.  He didn't attempt to help the other officers take Cletis Warren out of the vehicle.  He didn't attempt to try to handcuff him.").  The government thus affirmatively used the fact that Warren was not handcuffed and that Smith punched Warren instead of handcuffing him to argue that Smith's conduct constituted excessive force.

Indeed, the government never contended that Warren's testimony on this point was true.  On the contrary, the government instead argued in closing that Warren's obviously inaccurate testimony was a "red herring that doesn't really matter."  Tr.4 at 539:19-539:20.  The government implausibly speculated that perhaps Warren was "disoriented" or that perhaps he somehow confused the officers' "restraining him" with their hands as if it were handcuffs and shackles.  Tr.4 at 540:3-540:8.

That makes it all the more remarkable that, when Smith's counsel properly attacked Warren's false testimony on cross-examination,  the government improperly sought to rehabilitate Warren's testimony on the very point as to which it was clearly false.  RSA, at A13 (Tr.2 at 169:9-169:14).  The government introduced as a trial exhibit Warren's prior grand jury testimony.  RSA, at A17 (Tr.2 at 173:1-173:4).  In his grand jury testimony, Warren similarly testified that

48

he was shackled as he was being passed from the pickup. RSA, at A27. The government introduced the grand jury testimony in order to rebut Smith's counsel's suggestion on cross-examination that Warren had fabricated this testimony to support his civil lawsuit against Smith. RSA, at A17 (Tr.2 at 173:5-173:7). The government argued that, as Warren's grand jury testimony predated the filing of his lawsuit, it was admissible to rebut the alleged financial motive and the district court admitted the exhibit on that basis. RSA, at A17-A19 (Tr.2 at 173:11-175:11).[14]

*Third*, there is a reasonable likelihood that the admission of Warren's false testimony on this point affected the jury's verdict. The falsity of Warren's testimony was not a "red herring"; on the contrary, it touched on a material fact—whether Warren was handcuffed or shackled when punched by Smith. If a juror believed Warren's false testimony that he was handcuffed or shackled in the bed of the pickup truck, and that he was thus fully restrained when Smith punched him, then that would obviously impact the juror's view of whether Smith's conduct constituted unreasonable or excessive force. Under the lower standard of materiality in such government misconduct claims, the government's knowing inclusion of Warren's

---

[14] Although Smith's counsel did not object to the admission of the grand jury testimony, its admission was plainly inconsistent with Federal Rule of Evidence 801. Rule 801 states that a declarant-witness's prior testimony may be admitted to "rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." FED. R. EVID. 801(d)(1)(B)(i). But Warren testified that he "had talked to an attorney" *before* giving his grand jury testimony. RSA, at A16 (Tr.2 at 172:20-172:21). Warren's motive in falsifying his testimony to support his lawsuit was therefore already present when he testified before the grand jury. *Tome v. United States*, 513 U.S. 150, 156 (1995) (holding "that the prior consistent statement has no relevancy to refute the charge [of fabrication] unless the consistent statement was made *before* the source of the bias, interest, influence or incapacity originated" (emphasis added, internal citations omitted)).

49

false testimony could have reasonably affected the verdict on count 2. Therefore, the government's knowing inclusion of false testimony in its case constituted error.

### 3. *That Error Is Clear and It Affected Smith's Substantial Rights*

As demonstrated above, it is clear that Warren testified falsely and that the government knew or should have known that the testimony it presented and bolstered was false. Moreover, the government's conduct was plainly improper. First, by introducing the grand jury testimony when Warren's false testimony was attacked, the government failed in its duty to correct its witness's false testimony. *Giglio*, 405 U.S. at 153; *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) ("The duty to correct the false testimony of a Government witness is on the prosecutor."). As the Supreme Court has taught, "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, [is] implicit in any concept of ordered liberty…." *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959). Thus, the government's use of false testimony in prosecuting count 2 constituted clear error.

Moreover, the government's clearly improper conduct affected Smith's substantial rights, because, as demonstrated above, the government's presentation of this material, false testimony could reasonably have affected the verdict on count 2.

### 4. *This Clear and Prejudicial Error Seriously Affects the Fairness, Integrity, and Public Reputation of Judicial Proceedings*

Finally, the government's knowing presentation of Warren's false testimony seriously affected the fairness, integrity, and public reputation of these judicial

proceedings.  As this Court has averred, "[t]the knowing use of false testimony corrupts 'the truth-seeking function of the trial process.'" *Freeman*, 650 F.3d at 681. Moreover, the government's use of false evidence is inconsistent with "any concept of ordered liberty" and the "rudimentary demands of justice." *Napue*, 360 U.S. at 269; *Giglio*, 405 U.S. at 154.

Thus, in light of the considerations set forth by the Supreme Court in *Olano*—the fairness, integrity, and public reputation of the judicial proceedings— this plain error warrants the Court exercising its discretion under Rule 52(b) to vacate Smith's conviction on count 2.

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, Defendant–Appellant Terry Joe Smith requests that this Court direct entry of an acquittal on count 2 and count 3 of the indictment against him.  If the Court does not acquit Defendant–Appellant Smith on either count 2 or count 3, he requests that this Court reverse his convictions and grant him a new trial.


DATED:  July 9, 2015                    Respectfully submitted,

                                        Guha Krishnamurthi
                                        MUNGER, TOLLES & OLSON LLP

                                        s/ *Guha Krishnamurthi*
                                        Attorneys for Defendant, Appellant,
                                        Cross-Appellee TERRY JOE SMITH

## CERTIFICATE OF COMPLIANCE WITH

## FED. R. APP. P. 32(a)(7)(C), FED. R. APP. P. 32(a)(5)-(6), AND CIRCUIT RULE 32

The undersigned counsel for Defendant–Appellant certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, as this brief contains 13,886 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

The undersigned counsel for Defendant–Appellant certifies that this brief complies with the requirements of Fed. R. App. P. 32(a)(5), Fed. R. App. P. 32(a)(6), and Circuit Rule 32, as this brief has been prepared using Microsoft Word 2010 in Century font, a proportionally spaced typeface, with 12-point size in the body of the brief and 11-point size in the footnotes.

DATED:  July 9, 2015              Guha Krishnamurthi
                                 MUNGER, TOLLES & OLSON LLP

                                 s/ *Guha Krishnamurthi*
                                 Attorneys for Defendant, Appellant,
                                 Cross-Appellee TERRY JOE SMITH

Case Nos. 14-3744 and 14-3721

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

**Terry Joe Smith**

*Defendant, Appellant, and Cross-Appellee,*

v.

**United States of America**

*Plaintiff, Appellee, and Cross-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division
Case No. 2:14-cr-00006-WTL-CMM
Honorable William T. Lawrence

---

**REQUIRED SHORT APPENDIX
OF APPELLANT TERRY JOE SMITH**

---

MUNGER, TOLLES & OLSON LLP
Guha Krishnamurthi
*Guha.Krishnamurthi@mto.com*
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendant, Appellant, and Cross-Appellee
TERRY JOE SMITH

---

**ORAL ARGUMENT REQUESTED**

---

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

The undersigned counsel for Defendant–Appellant hereby states that all of the materials required by Circuit Rule 30(a) and 30(b) are included in this Required Short Appendix.

DATED:  July 9, 2015                    Guha Krishnamurthi
                                        MUNGER, TOLLES & OLSON LLP

                                        s/ *Guha Krishnamurthi*
                                        Attorneys for Defendant, Appellant,
                                        Cross-Appellee TERRY JOE SMITH

## REQUIRED SHORT APPENDIX
## TABLE OF CONTENTS[1]

Certification ........................................................................................................ ii

Indictment (Dkt. 1) ..........................................................................................A01

Transcript Excerpt – District Court's Ruling on Smith's Evidentiary Objection ...A05

Government Trial Exhibit 22 – Police Report[2] ........................................................A08

Transcript Excerpt – Government's Offer of Warren Grand Jury Testimony ........A11

Government Trial Exhibit 51 – Warren Grand Jury Testimony ............................A21

Transcript Excerpt – Smith's oral Rule 29 Motion ..................................................A32

Transcript Excerpt – District Court's Reservation on Smith's Rule 29 Motion ......A37

District Court's Rule 29 Decision (Dkt. 64) ............................................................A39

District Court's Judgment (Dkt. 95) ........................................................................A41

---

[1] "Dkt. #" means the district court's docket entry number.

[2] Redacted pursuant to FED. R. CRIM. P. 49.1 and FED. R. APP. P. 25(a)(5).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| TERRY JOE SMITH, a/k/a T.J. | ) | Cause Number: 2:14-cr- |
| | ) | |
| Defendant, | ) | **2 : 1 4** -cr- **0 0 0 6** WTL -CMM |

## INDICTMENT

## COUNT ONE

### (Deprivation of Civil Rights Under Color of Law)

### (18 U.S.C. § 242)

The Grand Jury charges that:

On or about November 6, 2011, near Moore's Bar in Greencastle, Indiana, in the

Southern District of Indiana, Terre Haute Division, TERRY JOE SMITH, a/k/a T.J., then a

Deputy with the Putnam County Sheriff's Department, while acting under color of the laws of

the State of Indiana, did deploy a taser on another person ("Individual #1") after other law

enforcement officers had secured Individual #1, resulting in bodily injury to Individual #1, and

thereby did willfully deprive Individual #1 of the right secured and protected by the Constitution

and laws of the United States to remain free from the use of unreasonable force by a law

enforcement officer acting under color of law.

All in violation of Title 18, United States Code, Section 242.

1

## COUNT TWO

### (Deprivation of Civil Rights Under Color of Law)

### (18 U.S.C. § 242)

The Grand Jury further charges that:

On or about September 7, 2012, near West Stardust Road in Cloverdale, Indiana, in the Southern District of Indiana, Terre Haute Division, TERRY JOE SMITH, a/k/a T.J., then a Deputy with the Putnam County Sheriff's Department, while acting under color of the laws of the State of Indiana, did punch another person ("Individual #2") in the face after other officers had secured Individual #2, resulting in bodily injury to Individual #2, and thereby did willfully deprive Individual #2 of the right secured and protected by the Constitution and laws of the United States to remain free from the use of unreasonable force by a law enforcement officer acting under color of law.

All in violation of Title 18, United States Code, Section 242.

## COUNT THREE

### (Deprivation of Civil Rights Under Color of Law)

### (18 U.S.C. § 242)

The Grand Jury further charges that:

On or about June 26, 2013, in the Lazy Acres Trailer Park in Greencastle, Indiana, in the Southern District of Indiana, Terre Haute Division, TERRY JOE SMITH, a/k/a T.J., then a Deputy with the Putnam County Sheriff's Department, while acting under color of the laws of the State of Indiana, did throw another person ("Individual #3") to the ground while Individual #3 was handcuffed and then drove a knee into Individual #3's back while Individual #3 remained

secured, handcuffed, and prone on the ground, resulting in bodily injury to Individual #3, and

thereby did willfully deprive Individual #3 of the right secured and protected by the Constitution

and laws of the United States to remain free from the use of unreasonable force by a law

enforcement officer acting under color of law.

All in violation of Title 18, United States Code, Section 242.

## COUNT FOUR

### (Deprivation of Civil Rights Under Color of Law)

### (18 U.S.C. § 242)

The Grand Jury further charges that:

On or about December 28, 2013, at the Cloverdale Truck Stop in Cloverdale, Indiana, in

the Southern District of Indiana, Terre Haute Division, TERRY JOE SMITH, a/k/a T.J., then a

Deputy with the Putnam County Sheriff's Department, while acting under color of the laws of

the State of Indiana, did throw Individual #4 to the floor inside of the truck stop and apply

pressure on Individual #4 to where she had difficulty breathing, then took Individual #4 outside

of the truck stop and placed her facedown into lava rocks in below freezing temperatures without

proper clothing and held her down onto the lava rocks with his body for an extended period of

time, resulting in bodily injury to Individual #4, and thereby did willfully deprive Individual #4

of the right secured and protected by the Constitution and laws of the United States to be free

from the use of unreasonable force by a law enforcement officer acting under color of law.

3

A03

All in violation of Title 18, United States Code, Section 242.

A TRUE BILL:

██████████████████████████████

FOREPERSON

JOSEPH H. HOGSETT
United States Attorney

By: _____

Bradley A. Blackington
Assistant United States Attorney

By: _____

MaryAnn T. Mindrum
Assistant United States Attorney

4

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF INDIANA
2                        TERRE HAUTE DIVISION

3

   UNITED STATES OF AMERICA,    )
4                               ) CAUSE NO.
          Plaintiff,            ) 2:14-cr-00006-WTL-CMM
5                               )
          -vs-                  )
6                               ) Terre Haute, Indiana
   TERRY JOE SMITH,             ) September 8, 2014
7                               ) 1:25 p.m.
          Defendant.            ) VOLUME 1
8

9                            BEFORE THE
                    HONORABLE WILLIAM T. LAWRENCE
10

11              OFFICIAL REPORTER'S TRANSCRIPT OF

12                          JURY TRIAL

13

14

   FOR THE GOVERNMENT:        Mr. Bradley A. Blackington
15                            Ms. MaryAnn Mindrum
                              Assistant United States Attorney
16                            10 West Market Street
                              Suite 2100
17                            Indianapolis, IN  46204

18  FOR THE DEFENDANT:        Mr. John L. Tompkins
                              BROWN TOMPKINS LORY & MASTRIAN
19                            608 East Market Street
                              Indianapolis, IN  46202
20

21

22  Court Reporter:    Cathy Easley Jones, RDR, FCRR
                       Official Court Reporter
23                     46 East Ohio Street, Room 291
                       Indianapolis, IN  46204
24

25          PROCEEDINGS TAKEN BY MACHINE SHORTHAND
               COMPUTER-AIDED TRANSCRIPTION
```

1  about their day.

2  Q   What's an SOR?

3  A   A signature of release from care from a -- an ambulance --

4  we have car accidents that people will come and get hurt, and

5  they'll sign an SOR or just get checked out and be released

6  from the scene.

7  Q   Was there anything minor in your view about Mr. Warren's

8  injury?

9  A   No.

10 Q   If a hospital -- if an ambulance is called to the scene

11 due to injuries, is there anything minor about it?

12 A   Not -- sometimes.

13 Q   What about this case?

14 A   For this case, no.

15 Q   Why did you write in the report that the injuries were

16 minor?

17 A   That's how I was told to write the report.

18 Q   By whom?

19 A   My supervisor, John Chadd.

20 Q   Based upon your observations at the scene, did you have an

21 opinion about whether Deputy Smith's use of force was

22 excessive or not excessive?

23         MR. TOMPKINS:  Your Honor, I would object to the

24 form of the question.

25         THE COURT:  Well, I believe that's covered by the

1  motion in limine.  I'm going to allow the question.

2  Overruled.

3  BY MR. BLACKINGTON:

4  Q   So if I may just state it again, based upon your

5  observations at the scene, do you believe that Deputy Smith's

6  use of force was reasonable or unreasonable?

7  A   Unreasonable.

8  Q   Why is that?

9  A   If anybody would have had to go hands on, it would have

10  been me or Josh Boller that were in the back of the truck.  He

11  did not punch us.  He did not kick us to hurt us in any way.

12  I would have simply not done -- I would have not punched him.

13  Q   Did you see or hear Mr. Warren do anything or say anything

14  that warranted being punched in the face?

15  A   No.

16  Q   After the incident and after you wrote your report, did

17  Deputy Smith make any statements to you?

18  A   Yes.

19  Q   What did he tell you about the incident?

20  A   He made comments to myself and Josh Boller that -- because

21  we told him that we wouldn't have punched him.  He basically

22  called us pussies.

23  Q   When you were at the scene, was your camera -- was your

24  vehicle equipped with a camera on the dashboard?

25  A   Yes.

## PUTNAM COUNTY SHERIFF'S DEPARTMENT

13 KEIGHTLY RD.
GREENCASTLE, IN 46135

CASE REPORT:   12-09-5042

(765) 653-3211 PHONE
(765) 653-9337 FAX

DATE:   9-7-12

| OFFENSE | I.C. CODE |
|---|---|
| Local Warrant, DUI Refusal, Criminal Recklessness w/ vehicle, Resisting Law Enforcement, Reckless Driving, Attempted Murder, Possession of Schedule II Controlled Substance, Possession of Schedule IV Controlled Substance, Battery on Law Enforcement Officer | |

| VICTIM'S NAME | | TX: |
|---|---|---|
| | | |

VICTIM'S ADDRESS

| VICTIM'S SEX | RACE | AGE | DOB | SSN# | PLACE OF TREATMENT |
|---|---|---|---|---|---|
| | | | | | |

| DATE & TIME OF OCCURENCE | DATE & TIME REPORTED | HOW REPORTED | RECEIVED BY: |
|---|---|---|---|
| 9-7-12 6:28PM | 9-7-12 6:28PM | Traffic Stop | Dispatch |

| REPORTED BY (NAME & ADDRESS) | TX: |
|---|---|
| | |

LOCATION OF OFFENSE
**Stardust Road**

| CITY | TOWNSHIP | COUNTY |
|---|---|---|
| Cloverdale | Cloverdale | Putnam |

| SUSPECT NAME: | CRIMINAL CHECK |
|---|---|
| Cletis Anthony Warren | YES |

| SUSPECT SOC/DOB | SUSPECT ADDRESS: |
|---|---|
| ███████████ | ███ Cloverdale, IN |

| DESCRIPTIONS: | Sex - | Race - | Hgt - | Wgt - | Hair - | Eyes - | Scars - | Tattoos - | Clothing |
|---|---|---|---|---|---|---|---|---|---|
| | M | W | 5-09 | 164 | BRO | GRN | | | |

| VEHICLE | MAKE | YEAR | COLOR | LIC. NO. | ISSUE YR.. | V.I.N. |
|---|---|---|---|---|---|---|
| | CHE | 1995 | GRN | 2612606 | 2012 | 1GCEK14Z1SZ214556 |

| NAME OF OWNER: | ADDRESS: |
|---|---|
| Melonie D. Lane | ████████ Cloverdale, IN ████ |

WHERE HELD:
**Putnam County Jail**

| BOND | INSR, FORCE, OR WEAPON |
|---|---|
| | |

| SCENE PROCESSING: | EVIDENCE COLLECTED: |
|---|---|
| | |

| MOTIVE: | METHOD OF OPERATION: |
|---|---|
| | |

| ARTICLES TAKEN: | PROPERTY RECOVERED: |
|---|---|
| | |

| WITNESSES: | APPROXIMATE VALUE OF LOSS: |
|---|---|
| | |

| NCIC/IDACS ENTRIES: | ATTACHMENTS: |
|---|---|



GOVERNMENT EXHIBIT 22

A08

| Deputy: | Philip Troyer 67-17 |
| --- | --- |

## Narrative

On Tuesday, September 4th, 2012 the Putnam County Sheriff Department received a suspicious vehicle on CR 1000 S and 100 E. The homeowner stated that a white male subject came to his door asked if he could get a ride to Stardust. The homeowner advised that the male subject stated his name Clint Warren. The homeowner then gave the male subject a ride to which he stated that he stopped in the middle of Lazy River Road after the male subject stated he could drop him off. On the early evening of 9-7-12 I received a call of a suspicious male behind a residence at 1009 W CR 1000 S. Deputy Josh Boller located a male in the tree line who was identified as Billy Lee Jones. Mr. Jones advised that he was in his green 90's model Chevy pick-up truck with Clete Warren who spotted deputies in the parking lot of the old bait store on CR 1000S and SR 243 and stated that he was wanted at which time Mr. Jones stated that he wanted out of the vehicle. Mr. Jones stated that he was possibly heading towards the Stardust area. At which time deputies proceeded to the Stardust area to try and locate Clete Warren who is Wanted out of Putnam County for Failure to Return to Lawful Detention Through Hendricks County Work Release Center.

At approximately 6:28PM on 9-7-12 I observed Mr. Jones' green truck traveling southbound on Stardust Road towards CR 1000 S, with Mr. Jones in the passenger seat, a female in the middle and another male driving the vehicle who was identified as Clete Warren who I am familiar with due to prior dealings with Mr. Warren. I pulled out behind the vehicle and observed Mr. Warren to constantly look in the rear-view mirror and back on the road. There was a dually truck hauling piece of heavy equipment in front of Mr. Warren. Deputy Josh Boller was on the east side of the roadway and Sgt. Jon Chadd was on the west side of Stardust Road in the grass off the road way at Stardust Rd near CR 1000 S. I then activated my emergency lights to perform a traffic stop, at which time Deputy TJ Smith pulled next to my commission and activated his emergency lights. Mr. Warren down shifted and accelerated in an aggressive manner southbound towards Deputy Josh Boller and Sgt. Jon Chadd to which he then struck Deputy Boller head on and continued without slowing down southbound on Stardust Road. Mr. Warren drove off into the grass on the west side of the road. Deputy Smith then pursued the vehicle off the roadway to where the truck struck the front passenger side of his vehicle. Mr. Warren then exited the vehicle and jumped into the bed of the truck. At which time all deputies involved surrounded the vehicle with lethal and non lethal weapons and ordered Mr. Warren out of the bed of the truck and onto the ground, to which he failed to comply with any verbal commands. At this time Deputy Boller and I entered the bed of the pick up truck and went hands on with the suspect attempting to gain compliance. The suspect continued to resist by rolling to his stomach, kicking his legs, attempting to kick Deputies; and would not show his hands as ordered as he kept his hands under his body. Due to unknown weapons or tools in the bed of the pickup truck, and due to his continual active resistance we forcibly removed him from the bed of the truck and onto the ground; at which time we were able to gain control of him and place him into wrist restraints and leg shackles. At some point during the struggle Mr. Warren sustained minor facial injuries.

A pack of cigarettes were located on the ground outside of the driver's seat where Mr. Warren exited. Inside the pack of cigarettes were an orange pill labeled M. Amphet Salts 20mg (generic for Adderall) that was identified through Poison Control as a Schedule II Controlled Substance. And two small blue pills labeled 2089 V identified as Alprazolam 1mg (generic xanax) a Schedule IV Controlled Substance.

Medics were called to the scene to check out Mr. Warren, Deputy Boller and Deputy Smith. For Mr. Warren's wellbeing he was transported to the Putnam County Hospital by Operation Life where he was treated and released by Dr. VanVuren. While at the

2

Putnam County Hospital I read Mr. Warren the Indiana Implied Consent to which he responded, "A breathalyzer?" I then advised him that it would be a blood draw and urine screen, to which he responded, "Absolutely not."

The female passenger was identified as Jana Guthrie(████) and stated that Cletis came to the house she was at and asked for a ride. Clete drove due to her or Billy not having a license. She stated that Cletis saw an officer at the entrance of Stardust and said he was going for it before the police had their lights on. Both Billy and Jana told him, "No," but he did, so Billy grabbed the shifter and put it in neutral and grabbed the wheel as Jana pressed on the brake. She stated that Cletis then jumped out of the truck and tried to run. The male passenger who was identified as Billy Jones Jr.(████) stated that Clete down shifted as I attempted to stop them, floored the truck slamming into Officer Smith. He then grabbed the gear shift and took it out of gear, grabbed the wheel and turned into the grass causing the truck to come to a stop. Clete then jumped out and an altercation began with him and the officers.

During the struggle Deputy Boller and Deputy Smith each ruined a pair of uniform pants. Due to Deputy Boller's complaint of pain Sgt. Jon Chadd sent him to the Putnam County Hospital to be checked out.

Respectfully Submitted:

Deputy Philip Troyer 67-17
Putnam County Sheriff Dept.
Case #12-09-5042

3

A10

1          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF INDIANA
2              TERRE HAUTE DIVISION

3
UNITED STATES OF AMERICA,    )
4                            ) CAUSE NO.
         Plaintiff,          ) 2:14-cr-00006-WTL-CMM
5                            )
         -vs-                )
6                            ) Terre Haute, Indiana
TERRY JOE SMITH,             ) September 9, 2014
7                            ) 9:00 a.m.
         Defendant.          ) VOLUME 2
8

9                  **BEFORE THE**
          **HONORABLE WILLIAM T. LAWRENCE**
10

11       OFFICIAL REPORTER'S TRANSCRIPT OF

12              JURY TRIAL

13

14
   FOR THE GOVERNMENT:      Mr. Bradley A. Blackington
15                          Ms. MaryAnn Mindrum
                            Assistant United States Attorney
16                          10 West Market Street
                            Suite 2100
17                          Indianapolis, IN  46204

18   FOR THE DEFENDANT:     Mr. John L. Tompkins
                            BROWN TOMPKINS LORY & MASTRIAN
19                          608 East Market Street
                            Indianapolis, IN  46202
20

21

22 Court Reporter:    Cathy Easley Jones, RDR, FCRR
                      Official Court Reporter
23                    46 East Ohio Street, Room 291
                      Indianapolis, IN  46204
24

25       PROCEEDINGS TAKEN BY MACHINE SHORTHAND
          COMPUTER-AIDED TRANSCRIPTION

A11

1  Q   And that's why you're in court with the clothing that you

2  have on now and leg shackles; is that correct?

3  A   Yes, sir.

4          MR. BLACKINGTON:  I don't have any other questions

5  of the witness, Your Honor.

6          THE COURT:  Your witness, Mr. Tompkins.

7          MR. TOMPKINS:  Thank you, Your Honor.

8                    **CROSS-EXAMINATION**

9  BY MR. TOMPKINS:

10 Q   We agree you're a convicted felon, right?

11 A   Yes, sir.

12 Q   Which back on September 7, 2012, you were using

13 methamphetamine?

14 A   Yes.

15 Q   How much had you used that day?

16 A   Maybe a quarter gram.

17 Q   A quarter gram?  And when during the day did you use it?

18 A   Noon.

19 Q   You were also drinking that day?

20 A   Yep.

21 Q   How much had you had to drink that day?

22 A   I drank early in the morning.  It was probably eleven

23 o'clock.  Two beers.

24 Q   Two beers, eleven o'clock in the morning.  Anything else?

25 A   No, sir.

1   Q    What time were you apprehended?

2   A    Six.

3   Q    P.m.?

4   A    Yes, sir.

5   Q    Do you recall telling the hospital personnel that your

6   last drink had been just prior to your arrival at the

7   hospital?

8   A    No, I don't.

9   Q    In addition to being a convicted felon, you have filed a

10  civil lawsuit against Terry J. Smith, correct?

11  A    Yes, sir.

12  Q    So you've got a financial interest in how this case goes,

13  right?

14  A    Yes, sir.

15  Q    Regarding the February 27th, 2014 conviction that the

16  government talked to you about, you were represented by an

17  attorney, right?

18  A    Yes.

19  Q    Justin Long represented you?

20  A    No, he was the prosecutor.

21  Q    He was the prosecutor?  And Mr. Tongret represented you?

22  A    Yes.

23  Q    And you all appeared in Putnam Circuit Court back on

24  February 23rd -- or I'm sorry, January 23rd of 2014, this

25  year, right; do you recall that?

1  A    I recall somewhere in that date, yes.

2  Q    On that day you admitted to resisting law enforcement?

3  A    Yes, I did.

4  Q    You were specifically asked whether on September 7th,

5  2012, you knowingly or intentionally forcibly resisted,

6  obstructed, or interfered with Josh Boller, a law enforcement

7  officer, right?

8         THE COURT REPORTER:  I'm sorry, I didn't get that last

9  answer.

10  A    Yes.

11  BY MR. TOMPKINS:

12  Q    And you admitted that you did do that?

13  A    Yes, sir.

14  Q    And that you used a motor vehicle in the course of doing

15  that?

16  A    Yes, I did.

17  Q    You were also asked, did you knowingly touch Josh Boller,

18  a law enforcement officer in a rude, insolent, or angry manner

19  while he was engaged in the execution of his duties, causing

20  Josh Boller pain?  You remember being asked that?

21  A    Yes.

22  Q    And you admitted to both of those?

23  A    Yes.

24  Q    That, again, had to do with ramming him with your vehicle

25  and fleeing with your vehicle?

1  A   Yes.

2  Q   When you were in the back of the truck, do you recall that

3  the officers had to repeatedly tell you to give you their

4  hands -- give them your hands?

5  A   I want to say yes.

6  Q   Now, is it your testimony that you were cuffed and

7  shackled in the back of the pickup truck?

8  A   Yes, I was.

9  Q   In the back of the pickup truck?

10  A   In the bed of the pickup truck.

11  Q   Before you were put over the side?

12  A   Yes.

13  Q   You know the difference between cuffs and shackles, don't

14  you?

15  A   Yes.

16  Q   Handcuffs are handcuffs, right?  Shackles are different.

17  You know that difference because you're a convicted felon, and

18  you've been to DOC, right?

19  A   Yes.

20  Q   What are shackles versus handcuffs?

21  A   Shackles are for your ankles.

22  Q   So it's your testimony here today that in the bed of the

23  pickup truck before you were passed out, you were both

24  handcuffed and shackled?

25  A   Yes.

 1          MR. TOMPKINS:  I don't have anything else, Judge.

 2          THE COURT:  Redirect?

 3                     **REDIRECT EXAMINATION**

 4  BY MR. BLACKINGTON:

 5  Q   Your testimony is that you filed a lawsuit against Deputy

 6  Smith; is that correct?

 7  A   Yes, sir.

 8  Q   Do you recall testifying in front of the federal grand

 9  jury in this matter?

10  A   Yes, I do.

11          MR. BLACKINGTON:  May I approach the witness, Your

12  Honor?

13          THE COURT:  You may.

14  BY MR. BLACKINGTON:

15  Q   The transcript of your testimony indicates that you

16  testified on March 4th of 2014.  Would that be about right?

17  A   Yes, sir.

18  Q   Did you file the lawsuit before or after you testified in

19  front of the federal grand jury?

20  A   I had talked to an attorney beforehand, but the lawsuit

21  was filed actually this year.

22  Q   Okay.  Was it in March -- and March 4th was this year as

23  well when you testified in front of the grand jury.  So did

24  you file the lawsuit before or after the grand jury?

25  A   After.

 1              MR. BLACKINGTON:  Your Honor, I would offer

 2   Government's Exhibit 51, and I don't have a sticker on it yet

 3   but I will.  It is a transcript of Mr. Warren's grand jury

 4   testimony.

 5              Your Honor, I offer it pursuant to the law that

 6   prior consistent statements are admissible to rebut charges of

 7   recent fabrication.

 8              THE COURT:  Mr. Tompkins?

 9              MR. TOMPKINS:  Your Honor, I don't think I alleged

10   recent fabrication.

11              MR. BLACKINGTON:  Based upon filing a lawsuit,

12   that's the allegation that's implicit is that he fabricated

13   his testimony to support a lawsuit.  That's why that

14   testimony's admissible to show bias, interest, recent

15   fabrication.

16              THE COURT:  Cite me to a rule, please.

17              MR. TOMPKINS:  Your Honor, in response to that, I

18   very specifically followed up with financial interest, not

19   impeachment for fabrication.

20              MR. BLACKINGTON:  That is impeachment, Your Honor.

21   Let me find the rule real quickly here.

22              MR. TOMPKINS:  I'll find the case law, Your Honor.

23              THE COURT:  Let's just approach.

24         (*Beginning of bench conference.*)

25              MR. BLACKINGTON:  I don't recall the numbers off the

1  top of my head, but I will.  I'll --

2          MR. TOMPKINS:  Can I give a quick -- may I just ask

3  for an instruction?

4          MR. BLACKINGTON:  I can't recall the rule number,

5  but 613 is prior inconsistent statements.  I remember the law.

6  I just can't give you a rule number off the top of my head.

7          THE COURT:  We can go off.

8      *(A bench conference was held off the record.)*

9          THE COURT:  If we can go back on.

10     *(A bench conference was held on the record.)*

11         THE COURT:  There has been some question as to the

12 admissibility of certain grand jury testimony with the

13 limiting instruction.  The defendant will not object to the

14 introduction of that.  The limiting instruction will be

15 thus -- make sure I'm right here.

16         The Government's Exhibit 51 is a certified copy of

17 Cletis Warren's grand jury testimony on March the 4th, 2014.

18 This grand jury testimony is admissible to rebut an allegation

19 or inference that Warren has fabricated his testimony because

20 of his financial interest in a lawsuit.  The grand jury

21 testimony is not admissible as evidence of what actually

22 occurred on September the 7th, 2012.

23         MR. BLACKINGTON:  Can I just suggest modifying that

24 by saying not as evidence of but as direct evidence of what

25 happened?

1          THE COURT:  Is not admissible as.

2          MR. BLACKINGTON:  As direct evidence of what

3  happened on September 7th.  That might be a little better.

4          MR. TOMPKINS:  Sure.

5          THE COURT:  All right.  Then what I'll do, you will

6  introduce that.  You will just say --

7          MR. TOMPKINS:  No objection.

8          THE COURT:  Subject to a limiting instruction.

9          MR. TOMPKINS:  Yes.

10          THE COURT:  I will then read this.  I will admit the

11  exhibit, and then you can proceed.

12          MR. BLACKINGTON:  Okay.  Thank you, Your Honor.

13      *(End of bench conference.)*

14          THE COURT:  Mr. Blackington.

15          MR. BLACKINGTON:  I would again offer Exhibit 51,

16  Your Honor.

17          MR. TOMPKINS:  Your Honor, with a limiting

18  instruction, I would not object.

19          THE COURT:  Very well.  Ladies and gentlemen of the

20  jury, Government's Exhibit 51 is a certified copy of Cletis

21  Warren's grand jury testimony on March the 4th, 2014.  The

22  grand jury testimony is admissible to rebut an allegation or

23  inference that Mr. Warren has fabricated his testimony because

24  of his financial interest in a lawsuit.  The grand jury

25  testimony is not admissible as direct evidence of what

1  actually occurred on September the 7th, 2012.

2       *(Government's Exhibit 51 was received in evidence.)*

3            THE COURT:  With that, Mr. Blackington, you may

4  proceed.

5            MR. BLACKINGTON:  I don't have any other questions

6  of the witness, Your Honor.

7            THE COURT:  Very well.  Mr. Tompkins?

8            MR. TOMPKINS:  One brief question, Your Honor.

9                    **RECROSS-EXAMINATION**

10  BY MR. TOMPKINS:

11  Q   Your testimony in front of the grand jury was also that

12  you were shackled in the back of the truck, correct?

13  A   Yes.

14            MR. TOMPKINS:  Nothing further.

15            THE COURT:  Very well.  Anything further,

16  Mr. Blackington?

17            MR. BLACKINGTON:  No other questions of the witness,

18  Your Honor.

19            THE COURT:  Very well.  May this witness be excused?

20            MR. BLACKINGTON:  Yes, Your Honor.

21            MR. TOMPKINS:  Yes, Your Honor.

22            THE COURT:  Very well.  You may step down.

23       *(Witness excused.)*

24            THE COURT:  Government, you may call your next

25  witness.

## NAME OF WITNESS:

### Cletis Warren

### GRAND JURY

### DATE: March 4, 2014

### ATTORNEY:

Name: Bradley Blackington



GOVERNMENT
EXHIBIT
51



Franzen & Robert
Reporting, In(

Jodie Franzen, RPR, CSR

2990 Market Tower                    (317) 636-38
10 West Market Street          Direct: (317) 289-49
Indianapolis, Indiana 46204    E-mail: jodie@frreporting.co

A21

# NAME OF WITNESS:

## Cletis Warren

## GRAND JURY

## DATE:  March 4, 2014

## ATTORNEY:

Name:  Bradley Blackington



Franzen & Roberts
Reporting, Inc.

Jodie Franzen, RPR, CSR

2990 Market Tower
10 West Market Street
Indianapolis, Indiana 46204

(317) 636-380
Direct: (317) 289-494
E-mail: jodie@frreporting.co

A22

### CLETIS WARREN

   having been first duly sworn to tell the
truth, the whole truth, and nothing but the
truth relating to said matter was examined and
testified as follows:

QUESTIONS BY MS. MINDRUM:

Q.   Good morning.  Can you please state and
     spell your name for the grand jury.

A.   Cletis Warren.  C-l-e-t-i-s, W-a-r-r-e-n.

Q.   What community are you from, Mr. Warren?

A.   Putnam County.

Q.   How long have you lived in Putnam County?

A.   Approximately 20 years.  I'm originally
     from there.

Q.   Were you arrested on September 7th, 2012?

A.   Yes, ma'am.

Q.   And was there an active warrant out for
     your arrest?

A.   Yes.

Q.   What was that warrant for?

A.   Failure to return to Hendricks County
     work release.

Q.   And were you near Stardust Road in

| | | |
|---|---|---|
| 1 | | Cloverdale, Indiana? |
| 2 | A. | Yes, ma'am. |
| 3 | Q. | Prior to your arrest were you in a truck? |
| 4 | A. | Yes. |
| 5 | Q. | Can you describe the truck. |
| 6 | A. | A green four-wheel drive Chevrolet truck. |
| 7 | Q. | And whose truck was that? |
| 8 | A. | Billy Jones. |
| 9 | Q. | Who was in the truck with you? |
| 10 | A. | Billy Jones and Jenna Gutherie. |
| 11 | Q. | And at some point while you were in the |
| 12 | | truck that day did you end up seeing |
| 13 | | police sirens and lights? |
| 14 | A. | Yes, ma'am. |
| 15 | Q. | And as a result of seeing the police did |
| 16 | | you try to escape? |
| 17 | A. | Yes, ma'am. |
| 18 | Q. | And were you driving the truck at that |
| 19 | | time? |
| 20 | A. | Yes. |
| 21 | Q. | And during your escape from the police |
| 22 | | did another police car come toward you? |
| 23 | A. | Yes, ma'am. |
| 24 | Q. | And did you later learn that to be Josh |
| 25 | | Boller's car? |

```
 1    A.  Yes.

 2    Q.  Did you collide with Josh Boller's car?

 3    A.  Yes, ma'am.

 4    Q.  And as a result of the collision where

 5        did your car go -- I mean where did the

 6        truck go?

 7    A.  The truck went off to the right into a

 8        field.

 9    Q.  And what did you do after the truck went

10        into the field?

11    A.  I tried to exit the truck, and when I

12        did, another officer's car was sliding

13        into the left rear of the truck.  I

14        jumped up on the hood to avoid the car

15        from hitting me and ended up in the bed

16        of the truck.

17    Q.  Did you later learn that that officer's

18        car to be TJ Smith's car?

19    A.  I assume so, yes.

20    Q.  So you're not -- you just know an

21        officer's car was coming toward your

22        truck?

23    A.  Right.

24    Q.  And you jumped onto the officer's car and

25        then into the bed of the truck?
```

```
 1     A.   Yes, ma'am.
 2     Q.   And what did you do when you entered the
 3          bed of the truck?
 4     A.   I actually just kind of looked around and
 5          the officers were coming at me and I laid
 6          down in the bed of the truck.
 7     Q.   Did you say anything when you jumped in
 8          the bed of the truck?
 9     A.   I said, "I'm through."  "I'm done."
10     Q.   And you said you laid down in the truck.
11          How did you lay down?
12     A.   Face down.
13     Q.   And did any officers also jump into the
14          truck with you?
15     A.   Yes, ma'am.
16     Q.   Do you know who?
17     A.   I think it was Philip Troyer and Josh
18          Boller.
19     Q.   Did you try to resist those officers?
20     A.   No, ma'am.
21     Q.   What did you do when they jumped into the
22          truck?
23     A.   I just laid face down in the bed of the
24          truck.
25     Q.   Did you try to punch, kick, --
```

```
1    A.   No, ma'am.

2    Q.   -- or bite them?

3    A.   No.

4    Q.   Did you say anything to them?

5    A.   I just told them I was finished.

6    Q.   Did the deputies then try to remove you

7         from the truck bed?

8    A.   Yes, ma'am.

9    Q.   How did they remove you?

10   A.   They kind of like dragged me over the

11        side of the bed of the truck.  It was

12        like to hand me over to another officer

13        or whatever.  I was shackled.

14   Q.   Do you recall how you were being held?

15   A.   Yeah.  I had one on each side of me and

16        then one was -- and then one guy had my

17        legs.

18   Q.   Were they trying to give you to any of

19        the -- were any officers on the other

20        side of the truck?

21   A.   Yes.

22   Q.   So there were officers on the ground as

23        well?

24   A.   Yes, ma'am.

25   Q.   Do you recall who was on the ground?
```

```
1      A.   TJ Smith was directly in front of me.

2      Q.   Were there other officers there?

3      A.   Yeah.   There was a couple other ones, but

4           I'm not sure exactly who.

5      Q.   So as the officers were handing you from

6           the truck bed to the officers on the

7           ground, what happened to you?

8      A.   I was punched in the face.

9      Q.   Did you see who punched you in the face?

10     A.   Yes.

11     Q.   And who was that?

12     A.   TJ Smith.

13     Q.   And how were you able to see TJ Smith?

14     A.   Because the way that they passed me over

15          the bed of the truck I was forced to look

16          straight at him.

17     Q.   And can you describe how he hit you?

18     A.   He uppercutted me in the face.

19     Q.   With a closed or an open fist?

20     A.   Closed fit.

21     Q.   And what did the punch feel like?

22     A.   It was the hardest -- honestly it's the

23          hardest I have ever been hit in my life.

24          He hit me hard enough to where it pretty

25          much just knocked me delirious a little
```

```
 1              bit.  I was bleeding out of my nose and
 2              around my eye.
 3        Q.    Were you able to really focus on what was
 4              going on after that punch?
 5        A.    No, ma'am.
 6        Q.    Did you hear anything that TJ said after
 7              he punched you?
 8        A.    Yeah.  He said he -- to be direct, he
 9              said:  I think I broke the MF-er's nose.
10        Q.    And when you said "MF-er", did he use the
11              real word?
12        A.    Yeah.
13        Q.    And did he sound like he was bragging
14              when he said that?
15        A.    Pretty much.  Yes, ma'am.
16        Q.    Did you go to the hospital as a result of
17              your injuries?
18        A.    Yes, I did.
19        Q.    And can you describe the extent of your
20              injuries.
21        A.    They run a CAT scan on my head.  I was
22              beat up pretty good.  I mean I blacked
23              both of my eyes.  My nose was pretty well
24              just busted up.  I don't know if it was
25              broke or not.  I don't really remember
```

```
 1              anything about it.  But I was treated,
 2              and they sent me back to Putnam County
 3              jail.
 4     Q.  Just to go back to your prior testimony,
 5              what were you on work release for?
 6     A.  Possession.
 7     Q.  Possession of?
 8     A.  Narcotics.
 9              MR. BLACKINGTON:  Any questions?
10              GRAND JUROR:  How many times were
11         you hit?
12              THE WITNESS:  I assume one time.
13         I'm not sure.  One time for sure.
14              MS. MINDRUM:  If there are no
15         further questions, I'll excuse this
16         witness.
17          (WHEREUPON the testimony of this
18          witness was concluded at this time.)
19
20
21
22
23
24
25
```

```
 1      STATE OF INDIANA     )
                             ) SS:
 2      COUNTY OF HAMILTON   )

 3              This is to certify that the attached
        proceedings for the United States Grand Jury
 4      in the matter of:

 5              Putnam County
                United States Courthouse
 6              46 East Ohio Street
                Indianapolis, Indiana 46204
 7              March 4, 2014

 8      were held as herein appears and that this is
        the original transcript thereof.
 9

10                              _____
                                Jodie Franzen, RPR, CSR
                                Court Reporter
11                              Notary Public

12      My Commission Expires:
        June 12, 2016
13      My County of Residence:
        Hamilton

14

15

16

17

18

19

20

21

22

23

24

25
```

Franzen and Roberts Reporting, Inc.

A31

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF INDIANA
2             TERRE HAUTE DIVISION

3

UNITED STATES OF AMERICA,    )
4                            ) CAUSE NO.
         Plaintiff,          ) 2:14-cr-00006-WTL-CMM
5                            )
         -vs-                )
6                            ) Terre Haute, Indiana
TERRY JOE SMITH,             ) September 10, 2014
7                            ) 9:30 a.m.
         Defendant.          ) VOLUME 3
8

9                    **BEFORE THE**
           **HONORABLE WILLIAM T. LAWRENCE**
10

11        OFFICIAL REPORTER'S TRANSCRIPT OF

12                   JURY TRIAL

13

14

15  FOR THE GOVERNMENT:        Mr. Bradley A. Blackington
                              Ms. MaryAnn Mindrum
16                            Assistant United States Attorney
                              10 West Market Street
17                            Suite 2100
                              Indianapolis, IN  46204
18
    FOR THE DEFENDANT:         Mr. John L. Tompkins
19                            BROWN TOMPKINS LORY & MASTRIAN
                              608 East Market Street
20                            Indianapolis, IN  46202

21

22  Court Reporter:    Cathy Easley Jones, RDR, FCRR
                       Official Court Reporter
23                     46 East Ohio Street, Room 291
                       Indianapolis, IN  46204

24

25        PROCEEDINGS TAKEN BY MACHINE SHORTHAND
          COMPUTER-AIDED TRANSCRIPTION

A32

1          COURT CLERK:  Please rise.

2     *(Jury out.)*

3          THE COURT:  Be seated, please.  Mr. Tompkins,

4  motions?

5          MR. TOMPKINS:  Your Honor, I would move for --

6  sometimes I get the terminology wrong because federal and

7  state courts use different words, but motion for directed

8  verdict, judgment on the evidence, involuntary dismissal --

9  I've heard it called all those things -- on all four counts.

10          As to all four counts, I don't believe that there's

11  sufficient evidence to support an inference of intent to

12  deprive either Mr. Dodson, Warren, Land, or Ms. Stwalley of

13  their civil rights.  I think the only evidence is that a force

14  commensurate with the threat that was presented was used and a

15  reasonable force commensurate to that threat in all four

16  cases; and particularly, I would stress Mr. Dodson's case.

17          THE COURT:  Thank you.

18          Mr. Blackington, do you wish to be heard?

19          MR. BLACKINGTON:  Just briefly, Your Honor.

20          I disagree with defense counsel's view of the

21  evidence.  I think in every case, with the exception of

22  Mr. Land's case, another police officer testified that in his

23  opinion, the use of force was unreasonable; and in Mr. Land's

24  case, I think there's enough evidence from him being

25  handcuffed and so forth and Mr. Land's own testimony from

1  which a reasonable jury can conclude that an unreasonable

2  amount of force was used.

3         THE COURT:  Mr. Tompkins?

4         MR. TOMPKINS:  Just very brief rebuttal, Your Honor.

5  And this in particular with Mr. Land's case, the opinion that

6  was offered about unreasonable force, on cross, it was clearly

7  established that the offense -- the officer saw it mid-air,

8  didn't see anything that led up to it.  And then you have

9  Mr. Land's testimony that he had repeatedly turned, disobeying

10 instructions, and the first response -- this is Mr. Land's

11 testimony -- was that he was returned to the side of the car

12 with more force but just to the side of the car with more

13 force, not hip-tossed at that point.

14         It wasn't until his second disobey of the more

15 forceful placement against the car and verbal command not to

16 move that he was hip-tossed; and the officer who offered the

17 opinion that it was excessive did not see any of that, said he

18 didn't see any of that, said his attention was in the exact

19 opposite direction and that the noise back at the car drew his

20 attention.

21         We then found out from Ms. Leathers that that noise

22 was the yelling of Mr. Land, whose voice she recognized was so

23 loud, she could hear it 50 yards away.

24         Officer Biggs also testified that what he saw in

25 terms of use of force to escort Mr. Land to the automobile was

1  appropriate, hand on shoulder, hand on forearm for a possibly

2  intoxicated subject to protect both the officer and the

3  subject.

4          So I don't think there is reasonableness in that

5  case.  As to Dodson's own testimony that he wanted to run, he

6  was trying to run, he had not been patted down and that he

7  would not show his hands, that there was, first, from Officer

8  Eastham testimony that he didn't see what happened before he

9  ran; but clearly, hands were not released.

10          He heard one tasing after there had been a physical

11  attempt by the first officer to Mr. Dodson to get his hands

12  out and cuff him; and only after that physical attempt at

13  cuffing did Mr. Smith arrive, ordered Fenwick off of him, out

14  of the way and then chose -- and this is the judgment call --

15  chose not to make physical contact again.  He had had physical

16  contact at the car.  Mo Fenwick had had physical contact on

17  the ground; and at that point, that would have been the third

18  physical contact to a suspect who had not been patted down and

19  had not shown his hands.

20          At that point, he was tased; and that's the use of

21  force from a man who admitted he was fleeing and trying to

22  resist arrest.

23          THE COURT:  The Court will treat the defense motion

24  as a Rule 29 motion for judgment of acquittal pursuant to Rule

25  29B.  I will reserve decision pending submission of this

 1  matter and the additional evidence, if there is to be any.

 2          MR. TOMPKINS:  Thank you, Judge.

 3          THE COURT:  All right, Mr. Tompkins, are you ready

 4  to proceed?

 5          MR. TOMPKINS:  May I have a moment to check and make

 6  sure people have arrived?  I believe I had ten o'clock as

 7  their arrival time, my first two witnesses, which will be

 8  Mr. Fenwick and Mr. Ensley.

 9          THE COURT:  Very well.  Why don't we just take -- in

10  fact, take your time and check.  I don't think we'll be in

11  official recess but take your time.

12          MR. TOMPKINS:  I'll be right back.

13  *(A recess was taken.)*

14          THE COURT:  Both sides ready for the jury?

15          MR. BLACKINGTON:  Yes, Your Honor.

16          MR. TOMPKINS:  Yes, Your Honor.

17          COURT CLERK:  Please rise.

18  *(Jury in.)*

19          THE COURT:  Be seated, please.

20          Ladies and gentlemen of the jury, the case will now

21  pass to the defendant.

22          Mr. Tompkins, you may call your first witness.

23          MR. TOMPKINS:  Thank you, Your Honor.  We would call

24  Steve Fenwick.

25          THE COURT:  Would you please stand and raise your

1               UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
2                TERRE HAUTE DIVISION

3

UNITED STATES OF AMERICA,  )
4                     ) CAUSE NO.
      Plaintiff,    ) 2:14-cr-00006-WTL-CMM
5                     )
      -vs-           )
6                     ) Terre Haute, Indiana
TERRY JOE SMITH,       ) September 10, 2014
7                   ) 9:30 a.m.
      Defendant.    ) VOLUME 3

8

9                  **BEFORE THE**
          **HONORABLE WILLIAM T. LAWRENCE**

10

11        OFFICIAL REPORTER'S TRANSCRIPT OF

12               JURY TRIAL

13

14

15  FOR THE GOVERNMENT:      Mr. Bradley A. Blackington
                     Ms. MaryAnn Mindrum
16                   Assistant United States Attorney
                    10 West Market Street
17                   Suite 2100
                    Indianapolis, IN  46204
18
    FOR THE DEFENDANT:      Mr. John L. Tompkins
19                   BROWN TOMPKINS LORY & MASTRIAN
                    608 East Market Street
20                   Indianapolis, IN  46202

21

22  Court Reporter:    Cathy Easley Jones, RDR, FCRR
                    Official Court Reporter
23                   46 East Ohio Street, Room 291
                    Indianapolis, IN  46204

24

25       PROCEEDINGS TAKEN BY MACHINE SHORTHAND
          COMPUTER-AIDED TRANSCRIPTION

1          THE COURT:  Very well.  All right.  We will then

2    develop a set which includes final instruction No. 7 and 11 as

3    recently modified.  We will make copies for the jury.  They

4    will be held until after argument.  The instructions are fair

5    game for final argument, if you wish.  Otherwise, we will

6    start at nine o'clock.

7          I note that you've moved the podium and ELMO to a

8    position that I assume is more conducive to your argument,

9    which is perfectly fine.

10         Anything else before we recess for the evening,

11   Mr. Blackington?

12         MR. BLACKINGTON:  No, Your Honor.  There's still a

13   Rule 29 motion pending.  Is this Court still taking that under

14   advisement?

15         THE COURT:  I am.  I am.  Any additional Rule 29

16   motion from the defendant at this point?

17         MR. TOMPKINS:  Your Honor, I will rest on previously

18   stated argument in support of that motion.

19         THE COURT:  Very well.  All right.

20         Anything additional from the defendant other than

21   that, Mr. Tompkins?

22         MR. TOMPKINS:  There is not.

23         THE COURT:  Very well.  We will be in recess this

24   afternoon until nine o'clock tomorrow morning.

25         COURT CLERK:  Please rise.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
|    **Plaintiff,** | ) | |
| | ) | |
|    **vs.** | ) | **CAUSE NO. 2:14-cr-6-WTL-CMM** |
| | ) | |
| **TERRY JOE SMITH a/k/a/ T.J.,** | ) | |
| | ) | |
|    **Defendant.** | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL**

After the Government rested, the Defendant Terry Joe Smith moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the Government did not present sufficient evidence to sustain convictions on Counts 1, 2, 3, and 4. Specifically, the Defendant argued that the Government did not present sufficient evidence to support an inference of intent to deprive any of the four victims of their civil rights. Further, the Defendant argued that the evidence that was presented showed that he used reasonable force commensurate with the threat that was present during the events that led to Counts 1, 2, 3, and 4.

At that time, the Court reserved its decision on the motion and continued with the Defendant's presentation of evidence. At the close of all the evidence, the Defendant reasserted its motion for judgment of acquittal on the same grounds noted above.

Thereafter, the Court submitted the case to the jury, and the jury returned a verdict of **GUILTY** on both Counts 2 and 3.

The Court now **DENIES** the Defendant's motion for judgment of acquittal.  The Court concludes that the evidence presented by the Government was sufficient to sustain convictions on Counts 2 and 3.

Pursuant to Rule 29(c)(1), the Defendant may move for a judgment of acquittal or renew such a motion within fourteen days after the guilty verdict.

SO ORDERED:  9/17/14

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

A40

AO 245B    (Rev 09/13) Judgment in a Criminal Case
            Sheet 1

# UNITED STATES DISTRICT COURT

<u>Southern</u>    District of    <u>Indiana</u>

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>**v.**<br>TERRY JOE SMITH | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:   2:14CR00006-001<br>USM Number:   12245-028<br><br><u>John L. Tompkins</u><br>Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☒ was found guilty on count(s)   2 and 3 _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 242 | Deprivation of Civil Rights Under Color of Law | 9/7/2012 | 2 |
| 18 U.S.C. § 242 | Deprivation of Civil Rights Under Color of Law | 6/26/2013 | 3 |

   The defendant is sentenced as provided in pages 2 through _____5_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☒ The defendant has been found not guilty on count(s)  1 and 4 _____

☐ Count(s) _____ ☐ is ☐ are  dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**A CERTIFIED TRUE COPY**
Laura A. Briggs, Clerk
U.S. District Court
Southern District of Indiana

By _____
                Deputy Clerk

12/4/2014
Date of Imposition of Judgment

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

12/12/14
Date

AO 245B    (Rev  09/13) Judgment in Criminal Case
       Sheet 2 — Imprisonment

Judgment — Page ___2___ of ___5___

DEFENDANT:        TERRY JOE SMITH
CASE NUMBER:      2:14CR00006-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:        14 months on each of Counts 2 and 3, to be served concurrently

☒ The court makes the following recommendations to the Bureau of Prisons:
That he be incarcerated as close as possible to Greencastle, Indiana, at the least restrictive security level consistent with his history.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a m. ☐ p m.    on _____ .

    ☐ as notified by the United States Marshal.

☒ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p m. on _____ .

    ☐ as notified by the United States Marshal.

    ☒ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____  to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev 09/13) Judgment in a Criminal Case
        Sheet 3 — Supervised Release

|  |  |
|---|---|
| Judgment—Page | 3 of 5 |

DEFENDANT:       TERRY JOE SMITH
CASE NUMBER:     2:14CR00006-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of  : 2 years on each count, concurrent

       The defendant must report to the probation office in the district to which the defendant is released within  2 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

☒ The above drug testing condition is suspended, based on the court s determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☒ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☒ The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐ The defendant shall comply with the re uirements of the Sex Offender Registration and Notification Act (42 U.S.C.  16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a  ualifying offense.  *(Check, if applicable.)*

☐ The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

       If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

       The defendant must comply with the standard conditions listed below as well as with any additional special conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer

2) the defendant shall report to the probation officer in a manner and fre uency directed by the court or probation officer

3) the defendant shall answer truthfully all in uiries by the probation officer and follow the instructions of the probation officer

4) the defendant shall support his or her dependents and meet other family responsibilities

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment

) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician

) the defendant shall not fre uent places where controlled substances are illegally sold, used, distributed, or administered

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or  uestioned by a law enforcement officer

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court  and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant s criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant s compliance with such notification re uirement.

AO 245B    (Rev  09/13) Judgment in a Criminal Case
           Sheet 3C — Supervised Release
_____
                                                          Judgment—Page    3 01   of    5

DEFENDANT:      TERRY JOE SMITH
CASE NUMBER:       2:14CR00006-001

## SPECIAL CONDITIONS OF SUPERVISION

1.         The defendant shall participate in a program of anger management as directed by the probation officer.

2.         The defendant shall perform   0 hours of community service as directed by the probation officer.

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the condition of supervision.

 These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed)
           _____        _____
           Defendant                                Date

           _____        _____
           U.S. Probation Officer/Designated    itness         Date

A44

AO 245B    (Rev 09/13) Judgment in a Criminal Case
          Sheet 5 — Criminal Monetary Penalties

| | | |
|---|---|---|
| | Judgment — Page | 4 | of | 5 |

DEFENDANT:        TERRY JOE SMITH
CASE NUMBER:     2:14CR00006-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $  200.00 | $  500.00 | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 1  U.S.C.    3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ | $ | |

☐ Restitution amount ordered pursuant to plea agreement _____

☐ The defendant must pay interest on restitution and a fine of more than  2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 1  U.S.C.    3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delin uency and default, pursuant to 1  U.S.C.    3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☒ the interest re uirement is waived for the   ☒ fine   ☐ restitution.

   ☐ the interest re uirement for the   ☐ fine   ☐ restitution is modified as follows:

Findings for the total amount of losses are re uired under Chapters 109A, 110, 110A, and 113A of Title 1  for offenses committed on or after September 13, 1994, but before April 23, 1996.

A45

AO 245B    (Rev 09/13) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___5___ of ___5___

DEFENDANT:       TERRY JOE SMITH
CASE NUMBER:     2:14CR00006-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of _____ due immediately, balance due

   ☐ not later than _____ , or
   ☐ in accordance   ☐ C   ☐ D   ☐ E, or   ☐ G below; or

**B** ☒ Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ G below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
   _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
   _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
   term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
   imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ If this case involves other defendants, each may be held jointly and severally liable for payment of all or part of the
   restitution ordered herein and the Court may order such payment in the future. The victims' recovery is limited to the
   amount of loss, and the defendant's liability for restitution ceases if and when the victims receive full restitution.

**G** ☐ Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is
due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

   Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
   and corresponding payee, if appropriate.

   <u>Defendant Name</u>               <u>Case Number</u>               <u>Joint & Several Amount</u>


☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s): _____

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

## CERTIFICATE OF SERVICE

The undersigned counsel for Defendant–Appellant certifies that, on July 9, 2015, he electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.  He further certifies that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


DATED:  July 9, 2015                    Guha Krishnamurthi
                                         MUNGER, TOLLES & OLSON LLP


                                         s/ *Guha Krishnamurthi*
                                         Attorneys for Defendant, Appellant,
                                         Cross-Appellee TERRY JOE SMITH